703 F.2d 147
 Juan Ramon VELA and Wenceslada Sanchez, Plaintiffs-Appellants,
Sylvia Munoz, Plaintiff-Appellee Cross-Appellant,
v.
Mark WHITE, etc., et al., Defendants,
Johnnie Byrd, etc., Defendant-Appellant Cross-Appellee,
R.J. Guerrero, Hector G. Garcia, H.G. Gonzalez and Raul
Salazar, Defendants-Appellees.
 No. 82-2078.
 United States Court of Appeals,
Fifth Circuit.
 April 18, 1983.
 
 Joseph R. Gilbreath, Bruce A. Pauley, Austin, Tex., for Byrd.
 Lee J. Teran, Roberto Garza, Israel M. Reyna, Laredo, Tex., for Munoz, Vela and Sanchez.
 Eustorgio Perez, Anthony C. McGettrick, Laredo, Tex., for Guerrero, Garcia, Gonzalez and Salazar.
 Appeals from the United States District Court for the Southern District of Texas.
 Before POLITZ and JOLLY, Circuit Judges, and HUNTER*, District Judge.
 PER CURIAM:
 
 
 1
 This case is affirmed for the reasons set forth in the district court's opinion, which we hereby adopt and attach as the Appendix to this case.
 
 
 2
 AFFIRMED.
 
 APPENDIX
 IN THE UNITED STATES DISTRICT COURT
 FOR THE SOUTHERN DISTSRICT OF TEXAS
 LAREDO DIVISION
 
 3
 JUAN RAMON VELA, ET AT., Sec.
 
 
 4
 Sec.
 
 
 5
 Sec.
 
 
 6
 Plaintiffs, Sec.
 
 Sec. CIVIL ACTION
 VS. Sec. NO. L-79-21
 
 7
 Sec.
 
 
 8
 R.J. GUERRERO, ET AL., Sec.
 
 
 9
 Sec.
 
 
 10
 Defendants. Sec.
 
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 
 11
 This case was tried before the Court without a jury, on January 12-13, 1982. As required by Rule 52(a), Fed.R.Civ.P., the Court will now make its findings of fact and conclusions of law. Whether or not repeated in this document, the Court adopts as part of its findings the seven paragraphs set forth on page two of the pre-trial order, under the heading "Uncontested Facts". This is a suit by three plaintiffs against, in the first instance, four different officers of the Laredo Police Department. The suit complains of two separate arrest incidents which occurred in November, 1978. If they can establish liability against the arresting police officers, Plaintiffs seek to additionally impose liability against the Chief of Police and the City itself. Since the two arrest incidents are factually unrelated, the Court will discuss each incident separately and then proceed to determine the liability of the Chief of Police and the City of Laredo.
 
 Juan Ramon Vela's Claim
 
 12
 Juan Ramon Vela ("Vela") is 22 years old and a resident of Laredo, Texas. On November 2, 1978, he resided at 1620 South Texas Avenue. At approximately 7-7:30 a.m., he exited his residence to look for a missing dog. He walked down Pecan Street for approximately one-half block where he encountered a neighbor, Jose Garcia, who was washing his automobile. Vela and Garcia chatted for a while. Vela then proceeded to walk back in the direction of his residence. At some point a city police van approached. A police officer, Defendant R.J. Guerrero, addressed Vela and asked for his name. Vela replied that his name was "Juan". The officer then asked his last name and Vela properly responded. At this point, according to Vela, Officer Guerrero exited his van and proceeded to arrest him. Vela's arms were handcuffed behind his back and he was placed in the police van and taken to the police headquarters. He was detained at police headquarters for approximately two hours, during which time he was fingerprinted and photographed. During interrogation, Vela was questioned about some robberies but apparently disclaimed any knowledge of them. He was then released upon the posting of a $50.00 bond by his mother. He was never given a written complaint but was told that he was being charged with disorderly conduct. On the same afternoon of his arrest and release, Vela went to Municipal Court. There he gave his version of the incident and the charges were dismissed. Vela had never before been arrested, jailed, searched, nor handcuffed. He was frightened and embarrassed by the incident. Because of his arrest, he was late for work that day which forced him to explain the situation to his employer, adding to his embarrassment.
 
 
 13
 The foregoing fact findings are made largely on the strength of Vela's testimony, inasmuch as that testimony was not inherently incredible and was totally unrebutted by the Defendants. Accordingly, the Court is satisfied that the Plaintiff proved his contentions by the preponderance of the evidence. Defendant Guerrero admitted arresting Vela on the occasion in question, because there are police records documenting the arrest. He testified, however, that he simply had no recollection of the incident. At the time of the arrest, Defendant Guerrero was accompanied by Police Officer Juan Javier Pena, but Pena could likewise remember nothing about the incident. The arrest records and the complaint against Vela, Plaintiff's Exhibits # 1 and 2, recite that he was arrested for disorderly conduct. At trial Defendant Guerrero testified that, as he wrote on the complaint, he actually arrested Vela for "acting in a suspicious manner" and attempting "to flee when approached". Guerrero conceded that such conduct would not fit well in any of the statutory definitions of disorderly conduct. Sec. 42.01, Texas Penal Code. Guerrero explained that at the time, he utilized a form printed complaint designed to be used for the various species of disorderly conduct. By adding handwritten language to the form complaint, Guerrero suggests that he was attempting to allege what he believed to be a violation of Article 14.03, Texas Code of Criminal Procedure.
 
 
 14
 Even if the Court were to accept Defendant Guerrero's theory of the facts, it would not support Vela's arrest. Article 14.03 is not a penal statute but instead is a procedural provision. It simply recites fundamental law, namely that any police officer may, without a warrant, arrest a person found in suspicious places "and under circumstances which reasonably show such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws." In other words, it is clear that "acting suspicious" is not in itself a crime and therefore is not a basis for an arrest. In the instant case, this is the most that Defendant Guerrero can offer. He testified that Article 14.03 gave him authority to "investigate" suspicious circumstances. While this proposition might well be true, there is a significant difference between an investigation and an arrest. An arrest cannot occur unless the investigation has blossomed into probable cause to believe that a crime has been committed. Even assuming, therefore, that Officer Guerrero had reason to stop and investigate Vela, there is not one scintilla of evidence indicating that this investigation then gave Guerrero probable cause to believe that Vela had committed a crime. Not only did Guerrero fail to recall what possible crime might have been involved, but the papers he executed at the time are totally devoid of any suggestion that Vela was reasonably suspected of having committed any substantive crime other than the purported crime of "acting suspicious". The Court, therefore, concludes that Defendant Guerrero, acting under color of state law, arrested Plaintiff Vela without a warrant and without probable cause to believe that Vela had committed a crime. Vela was thus deprived of liberty without due process of law. The Court finds that he sustained damages in the sum of $1,500.00.
 
 
 15
 Defendant Guerrero has pleaded that on the occasion in question he acted in "good faith", thus invoking the defense of qualified immunity. It is well settled that there are two components to the qualified immunity defense, one subjective and one objective. Fowler v. Cross, 635 F.2d 476 (5th Cir.1981). Under the objective prong, a police officer is not immune from liability if he reasonably should have known that the action he took would violate the constitutional rights of the plaintiff. Id. at 482. Put another way, the qualified immunity doctrine does not protect an official whose actions contravene settled, undisputable law, regardless of his subjective mental state at the time. Douthit v. Jones, 619 F.2d 527, 533 (5th Cir.1980). Under this standard, Defendant Guerrero's defense must fail. At least since Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it has been clearly established that a police officer cannot arrest a citizen without probable cause to believe that he has committed a crime simply because he is "acting suspiciously". This proposition has been so fundamental for so long that Defendant Guerrero must be held responsible for its violation.
 
 The Sanchez-Munoz Claim
 
 16
 Unlike the Vela incident, determination of this claim does require resolution of several factual conflicts, not only between the trial testimony of the Plaintiffs and Defendants, but also between the trial testimony of the Defendants and their previous sworn deposition testimony. The Court makes the following findings based on its determination of the preponderance of the evidence in this case.
 
 
 17
 On November 11, 1978, late in the evening, the Laredo Police had occasion to arrest Perfecto Munoz and another individual at a residence located at 3007 Napoleon Street. The two individuals were taken to the police headquarters and apparently were ultimately taken to the Webb County Jail. Perfecto Munoz is the son of Plaintiff Wenceslada Sanchez (Sanchez) and is the brother of Plaintiff Sylvia Munoz (now Sylvia Munoz Valls, herein referred to as "Munoz"). Shortly after that arrest, which is not an issue in this case, Sanchez went on her own initiative to police headquarters. She was accompanied by Munoz as well as by Rodolfo and Bertha Castillo and their three-year-old child. Sanchez wanted to know why her son was arrested and under what circumstances he could be released. At headquarters, Sanchez and her group approached a group of officers at the complaint desk. Sanchez was agitated, upset, and speaking in a loud voice. She demanded information about her son. Defendant Johnnie Byrd, now a Police Captain but then a sergeant, was on duty as shift supervisor. He engaged in conversation with Sanchez. He urged her to calm down and told her that any inquiries or arrangements about her son should be made at the Webb County Jail. He suggested twice that she leave and go downtown to the jail. Sanchez was not satisfied with his answer. Words were exchanged, the exact content of which is unestablished. The ruckus was becoming loud enough to interfere with the work of the dispatcher. Byrd and the other officers detected an odor of alcohol on Mrs. Sanchez' breath and that circumstance, combined with her conduct led them to believe that she was under the influence of alcoholic beverages. At some point during the exchange, Mrs. Sanchez referred to the officers as a group of "pendejos", a derogatory Spanish term loosely meaning fools or idiots. At this point Defendant Byrd ordered that Sanchez be arrested. Officer Gonzalez grabbed her, placed her arms behind her, and handcuffed her. Rodolfo Castillo protested that Sanchez was an older woman and should be left alone, whereupon Byrd ordered his arrest. Plaintiff Munoz began to cry, pleading that her mother not be harmed, whereupon Byrd also ordered her arrest. There is definite confusion in the evidence as to precisely which officer physically arrested which individual. In any event, Defendant Byrd is initially responsible for all three arrests. Despite totally contradictory evidence in his deposition, at trial Byrd took full responsibility for all three arrests, expressly claiming that he had ordered each of them. He was unquestionably the ranking officer at the scene. Defendants Salazar and Gonzalez agree with this assessment and there was no probative evidence to the contrary. The evidence further indicates that the actual physical arrest of Sanchez was done by Defendant Gonzalez and the arrest of Munoz was done by Defendant Salazar.
 
 
 18
 Upon their arrest, Plaintiffs Sanchez and Munoz were taken to a booking room.[1] There, each was handcuffed to a wall for approximately thirty to forty-five minutes. Sanchez was booked for "public intoxication and disorderly conduct" on a complaint signed by Defendant Gonzalez. Plaintiff Munoz was charged with "disorderly conduct" on a complaint also signed by Gonzalez (Plaintiffs' Exhibit # 6), although the original arrest record reflects the complainant against Munoz to be Defendant Salazar (Plaintiffs' Exhibit # 5). The two ladies were then driven to Webb County Jail where they stayed approximately twelve hours. Munoz spent most of the night crying in jail and did not eat anything. Neither Plaintiff slept that night. Neither Plaintiff had ever before been arrested, handcuffed or jailed, and each felt deep shame and humiliation about the entire incident. The charges against these two Plaintiffs were subsequently considered in Municipal Court and were dismissed. The notation on the complaint against Plaintiff Munoz is "insufficient evidence". The notation on the disorderly conduct complaint against Plaintiff Sanchez is, "insufficient evidence words tended to excite a breach of peace".
 
 
 19
 The Court first considers the claim of Plaintiff Munoz, which is considerably easier to resolve. Admittedly she was arrested without a warrant and the Court concludes from a preponderance of the evidence that there was absolutely no legal basis whatever for ordering her arrest. The only witness who even offered a possible justification for the arrest of Munoz was Defendant Byrd, who claimed that while he was in the process of trying to arrest Castillo, Plaintiff Munoz grabbed at his arm. Defendant Salazar, who claims to have actually arrested Munoz, does not corroborate this testimony nor does Officer Gonzalez. Moreover, in their depositions, neither Defendant Byrd nor Salazar could think of any reason why Plaintiff Munoz was arrested. (Byrd deposition, pages 18-20; Salazar deposition, pages 8, 13). The Court is convinced that Plaintiff Munoz was arrested because she became visibly distraught at the sight of her mother's arrest, began crying and possibly screaming, and at that point Defendant Byrd had simply become exasperated with the entire group. The Court concludes that Plaintiff Munoz has established a cause of action under Sec. 1983 and has proved damages in the sum of $3,500.00.
 
 
 20
 Liability for this injury would initially fall upon both Defendant Byrd, who ordered the arrest, and Defendant Salazar, who executed the order. Putman v. Gerloff, 639 F.2d 415 (8th Cir.1981). Each Defendant, however, pleads the defense of qualified immunity. As to Byrd, the defense is clearly not available. There being no reason for ordering the arrest of Munoz, the objective prong of the good faith defense cannot be satisfied. As to Salazar, the question is closer. At the time of the incident, he had been a police officer for less than a year. Byrd was his superior and was the ranking officer on duty. Salazar was not present when the fracas began. His attention was drawn by the loud voices and he came out to investigate. He arrested Munoz on a direct order by Byrd. Under these circumstances, the Court is convinced that Salazar is entitled to the defense of good faith. There is no indication that he bore any personal ill-will toward Munoz. The question of whether an officer is liable for arresting a citizen when following the direct orders of his superior is not clear and settled. Compare Nesmith v. Alford, 318 F.2d 110 (5th Cir.1963) with Anderson v. Nosser, 456 F.2d 835 (5th Cir.1972) (en banc). Under the circumstances of this case, it would not be fair to force Salazar to either violate a direct order or else stop and interrogate Byrd as to the reasons for his order, at the risk of being held liable for damages for an unlawful arrest.
 
 
 21
 Turning to the claim of Mrs. Sanchez, the thrust of her argument is that she could not have been constitutionally arrested under the Texas Disorderly Conduct Statute because either her conduct did not factually fit the proscriptions of that statute or if it did, the statute would be clearly unconstitutional as applied. The Court is inclined to agree, insofar as Mrs. Sanchez was charged with violating subsection (a)(1) of Sec. 42.01. As explained in the Commentary printed in Vernon's Penal Code, that section is designed to punish so-called "fighting words", defined in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) and Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). There is simply no evidence that Mrs. Sanchez uttered any words which would likely have a direct tendency to incite an ordinary person to violence. See Jimmerson v. State, 561 S.W.2d 5 (Tex.Cr.App.1978). On the other hand, Mrs. Sanchez was also charged with violating subsection (a)(5) of Sec. 42.01. That subsection makes it a crime to make "unreasonable noise in a public place". That prohibition must be read in conjunction with Sec. 42.04, providing that if the objectionable conduct consists of speech, the actor must first be ordered to move, disperse, or otherwise remedy the violation prior to her arrest. In this case, the Court finds that Defendant Byrd did ask Plaintiff Sanchez to quiet her voice or to leave prior to ordering her arrest. In Brown v. State, 594 S.W.2d 86 (Tex.Cr.App.1980), the Court upheld the arrest of an individual for shouting and screaming at a waitress, protesting the quantity and service of food in a restaurant. Noting that the individual had been arrested because of the loudness of her voice and not because of the content of her words, the Court found a valid arrest under Sec. 42.01(a)(5). In the instant case, the Court finds that the Defendant officers had probable cause to believe that Plaintiff Sanchez was violating that provision. Under any circumstances, the Court is convinced that the officers would be entitled to a qualified immunity defense. The officers arrested Mrs. Sanchez pursuant to a statute which is still in effect and under a subsection which has been upheld by the Texas Court of Criminal Appeals as recently as 1980. Plaintiffs have not called to the attention of the Court, nor can the Court find, any authority indicating that this particular subsection is unconstitutional on its face. Even if a court would now so hold, it would not affect the conclusion that in 1978, the Defendant officers had a good faith belief that the actions they took were lawful. In this connection the Fifth Circuit has quoted with approval the following language:
 
 
 22
 "The paradigm of 'reasonable grounds' for a good faith belief in the propriety of official action is reliance on a state statute later declared unconstitutional." Barker v. Norman, 651 F.2d 1107, 1125 (5th Cir.1981).
 
 
 23
 The Court concludes therefore that Plaintiff Sanchez is not entitled to prevail against any of the Defendant police officers under the theory of unlawful arrest.
 
 
 24
 Plaintiff Sanchez has also alleged that Defendants Byrd and Gonzalez used unnecessary excessive force in connection with her arrest. The only testimony offered in this regard was that Plaintiff's hands were placed behind her back when she was handcuffed and that in the process her left thumb was somehow twisted. The Court has considered the amount of force used in relationship to the need presented and has also considered the extent of the injury and the motives of the officers. Shillingford v. Holmes, 634 F.2d 263 (5th Cir.1981); Williams v. Kelley, 624 F.2d 695 (5th Cir.1980). The Court concludes as a matter of law that the slight force used in this case was not excessive under the circumstances. Plaintiff Sanchez, therefore, cannot prevail on this theory either.
 
 Claim Against Police Chief and City
 
 25
 All three plaintiffs seek to hold the Chief of Police and the City of Laredo responsible for the alleged misconduct of the police officers. Several possible theories for this liability appear from the pleadings and evidence. First, it is alleged that Chief Garcia and the City of Laredo "have wrongfully neglected to ensure against illegal and unconstitutional acts of their police officers to persons residing in the City of Laredo." (Paragraph 22, Third Amended Complaint). That instrument also contains allegations to the effect that the City and Chief Garcia neglected their "duty to hire competent, capable, and law abiding police officers". (Paragraphs 28, 34, 40.) To support these allegations, Plaintiffs essentially tried to prove two things:
 
 
 26
 1. that prior to 1978, Defendant Byrd had been the subject of at least three separate citizen complaints, none of which were properly investigated, and that he was promoted despite these complaints; and
 
 
 27
 2. that the Chief knew or should have known that his police officers were using the Disorderly Conduct Statute in an overly broad manner, because a substantial percentage of complaints under that statute were being dismissed by Municipal Court. Nevertheless, no adequate steps were taken to correct this abuse.
 
 
 28
 In evaluating these allegations and evidence, certain basic legal propositions must be noted.
 
 
 29
 While a governmental entity such as the City of Laredo is a "person" for purposes of Sec. 1983, it nevertheless cannot be held legally liable merely on a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, liability must be based upon a governmental policy or custom which is proved to be "the moving force of the constitutional violation." Id. at 694, 98 S.Ct. at 2037. Following Monell, the Fifth Circuit has held that a supervisory official cannot be liable merely for failing to adopt policies to prevent constitutional violations; however, he can be held liable if he affirmatively adopts policies which are wrongful or illegal. Reimer v. Smith, 663 F.2d 1316, 1323 (5th Cir.1981); Wanger v. Bonner, 621 F.2d 675 (5th Cir.1980). See also Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 48 L.Ed.2d 561 (1976), holding that in the absence of a pervasive pattern of intimidation by the named defendants, supervisory failure to act in the face of a statistical pattern of violations by other officers fails to state a claim cognizable under Sec. 1983. There is neither allegation nor evidence that either Chief Garcia or any other superior whose acts or edicts could fairly be said to represent City policy affirmatively adopted a policy of unlawfully arresting citizens, either under the Disorderly Conduct Statute or otherwise.
 
 
 30
 The alleged failure to adequately train the police officers is also not supported by the preponderance of the evidence. The evidence fell far short of establishing that the City was reckless or grossly negligent in its training, supervising, or disciplining of officers in general, Reeves v. City of Jackson, 608 F.2d 644 (5th Cir.1979), and particularly failed to indicate that Chief Garcia was personally involved in a pattern of activity designed to deny the Plaintiffs their constitutional rights. Watson v. Interstate Fire and Casualty Company, 611 F.2d 120 (5th Cir.1980). Indeed, the evidence indicates that sometime in September, 1978, Assistant City Attorney Ricardo De Anda discussed with Chief Garcia his concern that police officers misunderstood the meaning and scope of the Disorderly Conduct Statute. According to De Anda, Chief Garcia was most cooperative and interested in rectifying the problem. He promptly arranged for De Anda to lecture all police officers on the subject. The evidence further indicated that Chief Garcia took steps to improve the recording and analysis of information from the Municipal Court pertaining to the disposition of complaints. This evidence tends to confirm that neither Chief Garcia nor the city itself promulgated a policy of unlawful arrests nor condoned any misuse of the Disorderly Conduct Statute. On the contrary, the Chief took steps to correct the problem when called to his attention. In conclusion, the Court finds no basis for the imposition of any liability against Chief Garcia either personally or in his official capacity nor any liability against the City of Laredo itself.
 
 Conclusion
 
 31
 Plaintiff Vela is entitled to recover $1,500.00 in damages from Defendant Guerrero. Plaintiff Munoz is entitled to recover $3,500.00 in damages from Defendant Byrd. Plaintiff Sanchez shall recover nothing. No damages are awarded against Defendants Gonzalez, Salazar, Garcia, or the City of Laredo.
 
 
 32
 The two prevailing parties shall file their motion for attorney's fees within fifteen (15) days. Defendants shall have ten (10) days thereafter within which to file any challenge to the motion, either factual or legal.
 
 
 33
 DONE at Laredo, Texas, this 20th day of January, 1982.
 
 
 34
 /s/ George P. Kazen
 
 United States District Judge
 
 
 *
 District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 Much of what transpired after the arrest would also apply to Rodolfo Castillo but since he is not a plaintiff in this case, he will no longer be mentioned here