John LANGUIRAND, Plaintiff-Appellee
Cross-Appellant,

v.

John HAYDEN, An Individual,
Defendant,

City of Pass Christian, Etc., Defendant-
Appellant Cross-Appellee.

No. 81–4329.

United States Court of Appeals,
Fifth Circuit.

Oct. 17, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 30, 1983.

Lee N. Perry, George E. Morse, Frank P. Wittmann, III, Gulfport, Miss., for defendant-appellant cross-appellee.

Norman Breland, Gulfport, Miss., Walter J. Gex, III, Bay St. Louis, Miss., for plaintiff-appellee cross-appellant.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this case we venture into the labyrinth of municipal liability under 42 U.S.C.A. § 1983.[1] Conscious of the grievous injury suffered by the plaintiff-appellee, we nevertheless reverse because the evidence fails to establish such a custom or policy of the City defendant as required for municipal liability under section 1983.

## THE INCIDENT

On the evening of December 2, 1974, plaintiff John Languirand and his friends, Kim Merritt and Rickey Foley, drove from Bay St. Louis to Pass Christian, Mississippi. They were just "driving around." They stopped at a convenience store to buy some beer. Eventually, Foley requested they stop again so he could relieve himself. Languirand turned onto Shadowlawn, an unlit gravel road within the Pass Christian city limits. He drove up this road a short distance and stopped near the middle while Foley walked toward the side.

Meanwhile, about 10:30 or 11:00 p.m., John Hayden, a patrolman on the police force of defendant City of Pass Christian, had responded to a radio call concerning a prowler. He was near the reported location on Shadowlawn. As he drove onto this road, he turned off all the lights on his patrol car. He saw Languirand's car parked about "a hundred feet" from the residence of the person who had reported the prowler. Hayden stopped his car, got out, and turned on an overhead spotlight. Foley was moving back to the car. Hayden testified that he saw a shiny object in Foley's hands and that he shouted "stop" a number of times. Foley, however, testified that he was not carrying anything and that he heard nothing. Foley could not tell that the vehicle was a patrol car. Although Hayden testified that a flashlight was later found near the scene, this was not confirmed. He also stated that as Foley got in the car, it began to drive away and that he now saw the shiny object inside the car. Hayden testified that he was afraid because he thought this object was a gun. As the car began to drive away, Hayden fired his .357 Magnum revolver at the left rear tire of the car in an effort to stop it. Though he did not recall doing so, he fired a second shot also. During this time, John Languirand was bent over adjusting his tape deck, which was playing. He heard no warnings and did not see the patrol car pull up behind him. Suddenly, the spotlight was in his rearview mirror, he heard two shots,

---

1. 42 U.S.C.A. § 1983 provides in part:
   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

his foot slipped off the brake and hit the gas pedal, and the car went down the road until it veered off and struck a tree. Hayden's second shot struck Languirand in the base of the neck, which caused extremely severe permanent injuries, including partial paralysis from the chest down.

## PROCEEDINGS BELOW

Languirand filed suit on May 29, 1979, against Hayden and the City of Pass Christian ("City"). The case was tried to a jury before a United States Magistrate. The jury, in a general verdict without any special issues or interrogatories, found for Hayden and against the City for $1,500,000. The City appeals the judgment on the verdict against it. Languirand does not appeal the judgment in Hayden's favor.[2] Languirand's suit against Hayden was based on the assertion that Hayden used excessive force in his attempt to stop or apprehend Languirand. However, it was not claimed that Hayden intended to shoot Languirand or anyone else. Rather, it was Languirand's theory that Hayden was grossly negligent in his shooting at the car in an attempt to stop it.[3] The case against Hayden was submitted to the jury on the basis of whether he used excessive force and was grossly negligent in doing so, but the jury was also instructed to find for Hayden if he acted "in good faith with a reasonable belief under the circumstances, including his experience and training, in the validity of his conduct." The theory of the plaintiff's suit against the City was that Hayden was inadequately trained, particularly in the use of his pistol, and that the shooting of Languirand was, as this contention was phrased in the trial court's charge to the jury, "a proximate result of the alleged policy or custom of the City of Pass Christian of placing armed officers on the streets without adequate training in the use of weapons

2. Languirand has cross-appealed on whether the City should have been required to pay interest on the damage award, and to post a supersedeas bond on appeal. Our resolution of the appeal makes it unnecessary to reach these issues. Nor need we address the City's other arguments: whether *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), apply retroactively; whether the action was barred by the applicable Mississippi statute of limitations; and whether the court erred in admitting evidence of the City's subsequent training policy.

3. Plaintiff's witness, Senator Smith, a law enforcement and firearms expert who investigated the incident in his then capacity as an assistant sheriff (he later became a state senator), testified in response to questions by plaintiff's counsel that:

"He [Hayden] was not attempting to shoot anyone in the car. There were two shots fired. The first shot entered the lower left panel down by the tire of the car at an angle which was apparent to me that he was attempting to stop the car or was aiming at the tire. The second bullet entered above that, just a little bit to the right and entered just above the body of the car and went through the—this was a convertible car, by the way—went through the canvas and part back at the left side, left rear of the car.
" . . . .

"I simply think he fired the gun twice in rapid succession, attempting to shoot the left rear tire of the car out, and the second shot the gun jumped on him and the bullet went through the back of the car and struck the Languirand boy.
"Q. Do you think he intended to fire the second shot?
"A. I think he intended to fire it, but I think he was intending to fire it at the tire, and that the gun simply rose on him.
"Q. All right, sir. On the basis of your experience would you expect that a gun of that caliber, a .357 Magnum, to raise up when it was fired like that in rapid succession.
"A. Yes, sir, I would."
Plaintiff's counsel took the same position in argument to the trial court ("it is the plaintiff's position that all proof adduced in this trial so far shows that there was no intent upon the part of John Hayden to shoot the plaintiff here") and jury ("I have no doubt in my mind John Hayden did not intend to hurt John Languirand"). This position might have been influenced by Hayden's reliance on the Mississippi one year statute of limitations for "assault." Miss.Code § 15–1–35. When Hayden's motion for instructed verdict, based in part on this statute, was argued to the trial court just prior to submission of the case to the jury, the trial court in denying the motion stated, without contradiction by any counsel, "I'll state for the record it's *not charged* here that there was intentional tort in this case, nor do I think one has been proven." (Emphasis added.)

or firearms." The charge required a determination that the City was grossly negligent for a verdict to be rendered against it, but did not submit any good-faith defense with respect to the City.[4]

We reach only one issue—whether the evidence established the requisite custom or policy for which a city can be held liable under section 1983.

## MUNICIPAL LIABILITY UNDER SECTION 1983

Since 1978 the law regarding the liability of municipalities under section 1983 has been radically changed. In that year, the Supreme Court decided *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which overruled the holding in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that cities were not among the "persons" subject to suit under section 1983. The Court held that municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690, 98 S.Ct. at 2035. Moreover, a city can be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2035–36. With respect to custom, *Monell* quoted with approval the language of *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), that "practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell* 436 U.S. at 691, 98 S.Ct. at 2036 (footnote omitted).[5] However,

*Monell* ruled that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some sort caused a constitutional tort" and that "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691, 98 S.Ct. at 2036. As the Court stated, "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037.

The Court in *Monell* did not address all the possible variations and permutations of section 1983 actions against municipalities. In *Monroe v. Pape,* the Court had observed that section 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." 365 U.S. at 187, 81 S.Ct. at 484. However, *Monell* does distinguish between ordinary tort liability and the liability of governmental units under section 1983 in its holding that respondeat superior is not available in the latter situation. Moreover, in *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Court also distinguished between section 1983 actions against individuals and those against municipalities by denying the latter a good faith immunity. A distinction was also made between the section 1983 liability of governmental units and individuals in *Newport v. Facts Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), where it was held that the former were not subject to punitive damages, though the latter were.

---

4. We refer to the trial court's charge not for the purpose of expressing our approval or disapproval of it (no complaints of the charge are before us except one by the City which we do not reach), but merely as reflecting the theories on which the case was tried.

5. In the portion of *Adickes* just prior to that quoted in *Monell,* the Court stated, "... we think it clear that a 'custom, or usage, of [a] State' for purposes of § 1983, must have the force of law by virtue of the persistent practices of state officials." *Adickes* 398 U.S. at 167, 90 S.Ct. at 1613.

A footnote in the *Monell* opinion, in rejecting the argument for respondeat superior liability based on the contention that "liability follows the right to control the actions of a tortfeasor," states that "[b]y our decision in *Rizzo v. Goode,* [423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ], we would appear to have decided that the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Id.* 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58. In contrast to *Monell, Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), was not an action against a municipality, but rather against the individuals who were the mayor, city managing director, police commissioner, and other police supervisors of Philadelphia,[6] seeking injunctive relief under section 1983 on account of diverse incidents in which city police officers had, in the course of their duties, deprived various individual city residents of their constitutional rights. Approximately twenty such specific incidents were found by the trial court to have occurred during the preceding year, *id.* at 367–68, 96 S.Ct. at 602, which the Supreme Court noted, though found to reflect "a statistical pattern," was also found to be " 'fairly typical of . . . police departments in major urban areas.' " *Id.* at 375, 96 S.Ct. at 606. The Supreme Court, reversing the district court and Court of Appeals, held that there was no evidence to support a claim under section 1983 against the defendants. So far as we can determine, Justice Rehnquist's opinion for the Court in *Rizzo* makes no reference to failure to supervise or to the possibility of liability, or deficiencies in proof, in that or any similar

---

**6.** Similarly, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), in which the Supreme Court, in an opinion by Justice Rehnquist, indicated that negligent deprivation of property by governmental officials in the course of their duties might subject such individuals to suit under section 1983 if the plaintiff had no adequate state law remedies, did not concern the liability of governmental units *as such.* However, *Parratt,* unlike *Rizzo* in this respect, did *not focus on the nature of the* required nexus between the loss and the defendants' dereliction, or on how that might be affected by the character of the dereliction, but rather merely assumed a sufficient nexus in the case before it and went on to hold that in any event there was no cause of action because state law remedies were adequate. For these reasons, we do not consider that *Parratt* speaks directly to the issues we consider in the case at bar.

Further, it is difficult for us to discern from *Parratt* an overall pattern of section 1983 jurisprudence such as to throw meaningful light on the particular problems we seek to resolve here. We note that in a sense *Parratt* seems to potentially expand section 1983's reach, by its discussion of negligent deprivations. On the other hand, not only does its focus seem to be on procedural (rather than substantive) due process, but it heavily relies on the impropriety of "turning every alleged injury which may have been inflicted by a state official acting under 'color of law' into a violation of the Fourteenth Amendment cognizable under § 1983" so that "any party who is involved in nothing more than an automobile accident with a state official could allege a constitutional violation under § 1983." *Id.* at 544, 101 S.Ct. at

1917. The latter language is strongly reminiscent of the suggestion in *Paul v. Davis,* 424 U.S. 693, 698, 96 S.Ct. 1155, 1159, 47 L.Ed.2d 405 (1976), also authored by Justice Rehnquist, that "survivors of an innocent bystander mistakenly shot by a policeman or negligently killed by a sheriff driving a government vehicle" would not have claims under section 1983. We also note that the observation in Justice Powell's concurring opinion in *Parratt,* "arguably, if the absence of a tort remedy is the heart of one's constitutional claim, the defendant in the § 1983 suit must be the State itself, or its lawmakers, both of whom are immune from suit," *id.* at 550 n. 8, 101 S.Ct. at 1921 n. 8, is not addressed by the *Parratt* majority.

We have not found *Parratt* to impose liability on a municipality under section 1983 in all cases of injury caused by the municipality's negligence, even where the state law remedy may be inadequate. *See Hull v. City of Duncanville,* 678 F.2d 582 (5th Cir.1982) (alleged failure, even if intentional, of municipality to enforce speed limit and erect needed traffic control device at dangerous crossing, resulting in serious accident, does not state section 1983 claim against municipality, even if state law remedy were inadequate).

*Parratt* may well become a key to the weaving of an overall seamless web of section 1983 jurisprudence. The creation of such an overall pattern, however, is beyond our competence as an inferior court, and we are unable at this time to discern all the permutations of its likely eventual development by the Supreme Court.

We note that Hayden apparently had no qualified immunity under Mississippi law. *See Holland v. Martin,* 214 Miss. 1, 56 So.2d 398 (1952).

respect. Rather, the thrust of the opinion seems to be that the defendants were not shown to have done anything *affirmative* to bring about the complained of wrongs. Justice Rehnquist observed that "there was no *affirmative* link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." *Id.* at 371, 96 S.Ct. at 604 (emphasis added). The opinion expressly rejects the plaintiffs' contention that "petitioners' *failure* to act ... is indistinguishable from the active conduct enjoined in" other cases, *id.* at 376, 96 S.Ct. at 606, and relies on the district court's finding "that the responsible authorities had played no *affirmative* part in depriving any members of the two respondent classes of any constitutional rights." *Id.* at 377, 96 S.Ct. at 607 (emphasis added).

In *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), the Court described *Monell* as having "held that official policy must be 'the moving force of the constitutional violation' in order to establish the liability of a governmental body under § 1983" and then cited *Rizzo* for the proposition that a "general allegation of administrative negligence fails to state a constitutional claim cognizable under § 1983." *Id.* at 326, 102 S.Ct. 454.

Our research discloses no decision of the Supreme Court, or of this Court, which has made any holding, or given authoritative direction, on the issue of the liability under section 1983 of a governmental unit for injuries resulting from the lack of adequate training of its personnel. In *Berry v. McLemore,* 670 F.2d 30 (5th Cir.1982), we were faced with a section 1983 suit against a municipality based on injuries directly caused by the intentional misconduct of its chief of police. We observed that

"... some courts interpreting *Monell* have held that a municipal policy of authorizing or encouraging police misconduct can be inferred where the municipality has been *grossly negligent* in the hiring, training, or disciplining of its *police*

force. *See, e.g., Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981); *Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.), *cert. denied,* [444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979)]; *Popow v. City of Margate,* 476 F.Supp. 1237, 1245–46 (D.N.J.1979); *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978); *see also Reeves v. City of Jackson,* 608 F.2d 644, 652 (5th Cir.1979) (dictum)." *Id.* at 32–33 (emphasis added).

We described that interpretation as "this most expansive view of *Monell*" and "expressly decline[d] to rule on whether this interpretation of *Monell* is proper." *Id.* at 33 & n. 1. Such a ruling was not necessary because we found no evidence that the city's governing body was negligent in hiring or failing to train the police chief and because, with respect to the municipality's failure to discipline the police chief, "a municipal policy of authorizing or encouraging police misconduct ... cannot be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality." *Id.* at 33.

Other decisions of this Court, though not dealing with the issue of failure to train, have nevertheless emphasized the requirement that the wrongful act be taken pursuant to the municipality's custom or policy in order for the municipality to be liable under section 1983. *See Brewer v. Blackwell,* 692 F.2d 387, 400–01 (5th Cir.1982) (police chief's insistence that prisoner sign hold harmless agreement before release from jail not shown to be pursuant to any municipal policy or custom to require such agreements); *Walters v. City of Ocean Springs,* 626 F.2d 1317, 1323 & n. 3 (5th Cir.1980) (allegedly malicious warrantless arrest without probable cause does not give rise to municipal liability under section 1983 where there is no evidence "there existed a municipal policy or custom that, when carried out, inflicted the injury," and such a policy is not adequately shown by testimony that investigation in question "would meet the standards required by the [city] Police Department"). On the other hand, where the offending action carries out a municipal

policy or custom, we have found municipal liability under section 1983. *See Garris v. Rowland,* 678 F.2d 1264, 1274–75 (5th Cir.), *cert. denied sub nom. City of Fort Worth v. Garris,* —— U.S. ——, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982) (arrest in question was pursuant to "the procedure of the police department" to carry out an arrest on a valid warrant without further investigation "even though further investigation to determine if sufficient facts existed to formally file a charge against the arrestee was contemplated").

Though not involving the liability of a governmental unit as such, we believe this Court's opinion in *Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980), aptly illustrates some of the foregoing principles. There, the defendant sheriff, Bonner, was held individually liable under section 1983 for the actions of his deputies in searching throughout the Wangers' residence in connection with a middle-of-the-night attempt to serve an out-of-county arrest warrant specifying the address of the Wangers' house as that of Payne, the party named in the warrant. In fact, Payne was not present and apparently had never had any connection with the Wangers or that address, where the Wangers had lived for three years. No attempt was made to check the accuracy of the address information on the warrant, either before proceeding to the residence or following the Wangers' protest and production of identification when the deputies arrived and announced their purpose. Instead, the deputies simply proceeded to make a thorough search. Despite the fact that frequently as many as one fourth or one fifth of the warrants served would have incorrect addresses, it was the policy of the sheriff's office that "no attempt was made to verify the correctness of addresses on warrants received from other counties prior to attempting to serve them" and "the standard instructions from the Sheriff's Department were always to search the premises when informed that the person named in

the warrant was not present at the address listed on the warrant" even though there was no information, other than the listing on the warrant, that the address was correct and no attempt had been made to verify it. *Id.* at 679–80. In the incident in question, the deputies were acting pursuant to these policies. This Court's opinion commented that the defendant sheriff's *"failure* to adopt policies to prevent constitutional violations . . . [w]ould *not* be an adequate basis for [his] liability under § 1983," but affirmed a judgment against the sheriff because "his liability was based upon *affirmative* policies that he acknowledged adopting concerning the manner in which arrest warrants were to be served . . . that . . . had precipitated the alleged unconstitutional actions of his deputies." *Id.* at 680–81 (emphasis added).

This rationale was followed in *Reimer v. Smith,* 663 F.2d 1316 (5th Cir.1981), in upholding the dismissal of a section 1983 complaint against a Texas Ranger captain grounded on the actions of his subordinates, it being alleged that "as their superior officer" he "was negligent in his failure to supervise them." *Id.* at 1323. The *Reimer* opinion observes: "In *Wanger* . . . we stated that a supervisory official could not be held liable for failing to adopt policies to prevent constitutional violations . . . ." *Id. See also Vela v. White,* 703 F.2d 147, 153 (5th Cir.1983).

We will not attempt a review of the numerous decisions in other Circuits touching on these points. As might well be expected, they are not entirely harmonious. Some of these decisions, while allowing section 1983 recovery against a municipality for failure to properly train and discipline police officers, nevertheless apparently require that this be an essentially systemic failure resulting in a pattern of police misconduct. *See, e.g., Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981).[7] *See also*

---

7. In *Herrera,* plaintiff sued the city under section 1983 for the beating intentionally inflicted upon her by its police officers, claiming "that the City's failure to properly hire, train, retain,

supervise, discipline and control" the officers *"directly* caused her tortious injury." *Id.* at 1224. The Court observed that "[i]n order to prove her case" plaintiff "had to establish that

*McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir.1979) ("must show that the defendant was adequately put on notice of prior misbehavior"). Such a requirement would appear to be consistent with the general rule as to the requirement of proof of custom or policy. *See Powe v. City of Chicago,* 664 F.2d 639, 649–52 (7th Cir.1981). Other decisions, however, indicate that "citizens do not have to endure a 'pattern' of past police misconduct before they can sue the city under section 1983," and that recovery may be had for injury that "results from the complete lack of training or grossly inadequate training of a *police force*" provided such is "the result of a deliberate and conscious indifference by the city." *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978) (emphasis added). *See also Hays v. Jefferson County, Ky.,* 668 F.2d 869, 874 (6th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982). *But see id.* at 876–78 (dissenting opinions). Still others may indicate that recovery on such a theory may be had against a municipality on the basis of a single incident and without proof of a general failure to train. *See Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). *But see Popow v. City of Margate,* 476 F.Supp. 1237, 1246–47 (D.N.J. 1979).

■ We also observe that it is well settled that a municipality may be liable under section 1983 for the intentional conduct of its governing body, even though such conduct is an *ad hoc,* isolated, individual action not taken pursuant to any overall municipal custom or policy. *See, e.g., Newport v. Facts Concerts, Inc., supra* (city council); *Owen v. City of Independence, supra* (city council); *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980) (school district board of trustees). This is also true regarding deprivations directly caused by the intentional actions of individual officials respecting a subject matter where they have the legal "final authority," and are the "ultimate repository of . . . power," of the governmental unit in question. *Familias Unidas,* 619 F.2d at 404. But we have held city police chiefs *not* to be such officials, even as to their intentional actions, as they are almost uniformly subordinate to the city's governing body. *Brewer v. Blackwell,* 692 F.2d at 401; *Berry v. McLemore, supra. Cf. Bennett v. City of Slidell,* 697 F.2d 657, 661 (5th Cir.), *rehearing granted,* 706 F.2d 533 (5th Cir.1983) (deprivation *directly* caused by *intentional* acts of city building inspector and city attorney).

■ We conclude that if there is a cause of action under section 1983 for failure to properly train a police officer whose negligent or grossly negligent performance of duty has injured a citizen, that such failure to train must constitute gross negligence amounting to conscious indifference, and that a municipality is not liable under section 1983 for the negligence or gross negligence of its subordinate officials, including its chief of police, in failing to train the particular officer in question, in the absence of evidence at least of a pattern of similar incidents in which citizens were injured or

the City had notice of prior misbehavior and that its failure to act upon such knowledge caused her injury." *Id.* The Court indicated its approval of the rule that where "'senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts.'" *Id.,* quoting from *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). *Herrera* went on to note that a municipality could be liable if it "fails to train its *police force*" and that "a municipality's con-

tinuing failure to remedy known unconstitutional conduct of its police officers is the type of informal policy or custom that is amenable to suit under section 1983." *Id.* at 1224 (emphasis added). In sustaining recovery against the city, the Court observed that it was "adequately notified" (by numerous prior incidents, including one hearing at which "nearly forty separate complaints of police misconduct" were made) that its "police force needed close and continuing supervision. It, however, permitted its overzealous *police force* to *continue* its overlording. The inevitable result was the kind of misconduct that caused [plaintiff's] physical beating . . . ." *Id.* at 1225 (emphasis added).

endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force. Viewing the evidence against this standard, and in the light required by *Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969), we find it insufficient to make out a *prima facie* case of section 1983 liability against the City. Hence, we hold that the trial court erred in failing to grant the City's motions for directed verdict and for judgment n.o.v.

## EVIDENCE CONCERNING THE CITY'S LIABILITY

█ Hayden was hired by the City's police department as a dispatcher in January 1974. He had graduated from high school in 1971, and before his employment with the police department had successfully completed a two-year junior college course in which he was awarded an Associate Degree in Law Enforcement. This course, however, did not include field training or actual practice in the use of weapons. Hayden's twenty-first birthday was in March 1974. In August 1974, he passed, with a score of 81, a civil service examination and was made a patrolman (though the evidence is unclear, it appears Hayden also took and passed a civil service examination before becoming a dispatcher). The examination was prepared and administered by the City's civil service commission.

Hayden was scheduled to attend the Mississippi Law Enforcement Officers' Academy for an eight-week law enforcement training course, including weapons firing, beginning in September 1974. However, he was married on August 30, and pursuant to his request, was allowed to postpone his attendance at the Academy.

There is nothing to suggest that prior to the incident in question Hayden's performance of duty was in any way deficient, or

that anything in it, or otherwise in his past, reflected adversely on him.

The evidence was conflicting as to the extent of Hayden's training and ability to use his revolver. Hayden testified he shot on his own in the woods and at a target range, and was able to hit what he was aiming at. Gerald Peralta, who was the City's chief of police from 1969 until August or September 1974, testified that he required new officers to qualify on the firing range before being allowed to carry a weapon, and that he assumed, though he could not specifically recall, that Hayden did so.[8] However, Hayden admitted that he had not received formal training in the use of his weapon, and the jury was free to find that he had not qualified and that his testimony as to the extent of personal practice and skill in the use of the weapon was exaggerated. While Peralta and Johnson, the assistant police chief who became acting chief on Peralta's departure, each expressed the opinion that Hayden was fully competent to handle his patrolman job, the jury was free to find otherwise, particularly considering the testimony of Senator Smith, based on his investigation of the incident (*see* note 3, *supra*), that at the time in question Hayden had not "had the minimum training that was necessary for him to do his job."

Hayden, having been suspended on account of the incident, "resigned" two days after its occurrence. The investigation of the incident was conducted by the sheriff's department, partially at the request of the new police chief, Edward Alley, who had commenced his employment with the City on the morning of December 2, 1974. Alley shortly thereafter instituted a policy that "every police officer riding in a squad car has to go to police academy [the Mississippi Law Enforcement Officers' Academy] before he gets in the car."[9]

There is simply no evidence that the City, or its police force, had any policy or custom

8. Hayden and Peralta's son were friends, and Hayden had frequently visited in the Peralta home. Hayden was apparently something of a protégé of Peralta.

9. This evidence was admitted only so far as it might show the feasibility of such a procedure. *See* Fed.R.Evid. 407.

of resort to weapons, or other employment of significant force, in circumstances which might be deemed improper, unnecessary, or dangerous. There was no evidence of any other incident which involved, or which anyone claimed involved, police misconduct or even any simple negligence on the part of the police. Apart from the incident in question, there was no evidence that any police officer had ever acted, or was claimed to have acted, in an improper or negligent manner, or even that any citizen had been injured, or exposed to risk of injury, in *any* incident involving the police. There was no evidence that anyone on the police force, other than Hayden, lacked sufficient skill, training, and experience to be qualified for and able to adequately perform the position he or she held.[10] There is simply no evidence that the City had any policy or custom of placing armed officers on the streets who lacked adequate training, skill, and experience in the use of firearms.

Of course, if the City had had in force the policy that Chief Alley subsequently promulgated, and which Smith testified he believed all cities should have, Hayden would not have gone on patrol without having first attended the Academy. But under the evidence here, this failure to have earlier adopted an Alley-type policy cannot be converted into *having* a policy of *placing* incapable police officers on patrol. There is simply no showing that such was the case. Whatever policies the City may have failed to adopt respecting training, there is no showing that any of its officers, other than Hayden, were not adequately equipped, by training, experience, and ability, to competently perform their jobs. What we are dealing with here, so far as this record

discloses, is one isolated incident in which the police chief negligently, or grossly negligently, allowed one particular inadequate officer to go on patrol, and this officer's inadequacies resulted in one particular incident of negligent or grossly negligent injury to a citizen. Grievous and regrettable as that incident and injury indisputably are, that does not convert this case to one of municipal policy or custom under section 1983.

Nor does the evidence here warrant a finding that the City's governing body was itself grossly negligent in allowing Hayden to go on patrol without adequate training or experience. These were matters which were handled by the police chief, and both occupants of that position during the time in question thought that Hayden was capable of doing his job. Steven Saucier, the mayor during this period, testified at trial, "Not that I know of," when asked, "Had Mr. Hayden had any formal weapons training that you know of prior to December 2, 1974?" Saucier also testified that he did not know what experience Hayden had shooting a .357 Magnum pistol or what Hayden learned in this law enforcement education course at the junior college. Under the evidence here, this testimony is insufficient to support a finding that the members of the City's governing body were themselves grossly negligent, or consciously indifferent to the welfare of the citizens, in failing to prevent Hayden from going on patrol without further training. There is no evidence that they knew or believed he was likely incapable of doing the job, or that they had compelling cause or occasion to question the judgment of the chief or acting chief.

---

**10.** Peralta testified that Hayden was the only one on the force who had not successfully completed the Mississippi Law Enforcement Officers' Academy course. Senator Smith stated there were then some (unspecified) other officers on the City's force who had not been to the Academy, but a fair reading of his testimony as a whole indicates this was not so much stated on personal knowledge as it was a statement that he did not know the officers had been or was informed they had not. Even assuming this testimony was on personal

knowledge, however, in any event it is plain that Smith never testified (nor did any other witness) that there were *any* officers (identified or not) on the force, other than Hayden, who were inadequately trained or lacked the necessary skills and experience to be qualified for the position, or that the force in general lacked the necessary skills, experience, or training. Obviously, the Mississippi Academy is not the only place a police officer can receive adequate training.

## CONCLUSION

Certainly, there is evidence from which the jury could reasonably conclude that Hayden was grossly negligent on the occasion in question and, arguably, that the City police chief was grossly negligent in sending Hayden on patrol without additional training. However, because there was no evidence that the City police force in general was inadequately skilled or experienced, that there had been any other actual or claimed incidents of police misconduct or negligence, that the City had any general policy or custom of sending unskilled or inexperienced officers on patrol, or that the members of the City's governing body were themselves grossly negligent in failing to prevent Hayden's going on patrol without additional training, we hold that there has been an insufficient showing to authorize imposition of section 1983 liability on the City itself. We accordingly reverse the judgment below against the City.

REVERSED.

GOLDBERG, Circuit Judge, specially concurring:

I concur in the result.