Terry Dean ROGAN, Plaintiff,

v.

CITY OF LOS ANGELES, a municipal corporation; Richard Crotsley and Lester Slack, individually and in their official capacities as detectives of the L.A. P.D., Defendants.

No. CV 85–0989 RJK (Mcx).

United States District Court, C.D. California.

July 20, 1987.

Paul Hoffman, ACLU Foundation of Southern California, Los Angeles, Cal., Barry L. Bostwick, Bostwick & Ackerman, Santa Monica, Cal., William T. Street, ACLU Central Michigan Chapter, Saginaw, Mich., for plaintiff.

Robert Seeman, Asst. City Atty., Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, Senior District Judge.

### I. INTRODUCTION

This is an action under 42 U.S.C. section 1983 for money damages, declaratory relief, litigation costs and attorneys' fees against: (a) the City of Los Angeles ("the Defendant City"); and (b) two police officers employed by the city, Defendant Crotsley and Defendant Slack (referred to hereinafter collectively as "the Defendant Officers"). The action arises out of the alleged deprivation of Plaintiff Terry Dean Rogan's constitutional rights resulting

from his mistaken arrests for robbery and murder.

Pending before the Court are the parties' cross motions for summary judgment on the issue of liability.[1] The material evidentiary facts are uncontroverted.

## II. ANALYSIS

### A. 42 U.S.C. 1983 ACTION AGAINST THE CITY OF LOS ANGELES.

■ In order to state a civil rights claim against a municipality under 42 U.S.C. section 1983, a plaintiff must show that: (1) he has suffered a deprivation of a constitutionally protected interest; and (2) said deprivation was caused by an official policy, custom or usage of the municipality. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690–691, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *Powe v. City of Chicago*, 664 F.2d 639, 643 (1981). Each element will be discussed below.

1. Inexplicably, Plaintiff also moves for summary judgment on certain pendant claims under the California Constitution. The Court dismissed said claims without prejudice during a Pre-Trial Conference held on August 4, 1986.

2. McKandes obtained a copy of Plaintiff's birth certificate from one Derrick Smith ("Smith"). Said birth certificate was in good condition. Plaintiff testified that he tore up and threw away his copy of his birth certificate because it was mutilated. Plaintiff further testified that he has known Smith since he was young, and that Smith went to school with his brothers and sisters.

Defendants strongly emphasize this evidence, but fail to explain it's significance, if any. Defendants apparently infer that Plaintiff was improperly involved in the transfer of his birth certificate from Smith to McKandes.

Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("*Liberty Lobby*"); *First National Bank of Arizona v. Cities Service Company*, 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Summary judgment may be granted if the evidence is merely colorable, or is not significantly probative. *Liberty Lobby*, 106 S.Ct. at 2511; *First National Bank*, 391 U.S. at 290, 88 S.Ct. at 1592; *Drombrowski v. Eastland*, 387 U.S. 82, 87,

### 1. DEPRIVATION OF A CONSTITUTIONALLY PROTECTED INTEREST.

#### a. RELEVANT FACTS.

During 1981, Bernard McKandes ("McKandes"), an escapee from an Alabama state prison, started using Plaintiff's name after he obtained Plaintiff's birth certificate. McKandes obtained the birth certificate at Saginaw, Michigan, Plaintiff's birthplace and place of residence.[2]

After obtaining Plaintiff's birth certificate, McKandes proceeded to California. McKandes there used Plaintiff's birth certificate to obtain a California driver's license and various other identification documents in Plaintiff's name.

Sometime during 1982, McKandes was arrested by the Los Angeles Police Department ("LAPD") on suspicion of murder. McKandes was using the false identification in Plaintiff's name at the time of his arrest. The LAPD released McKandes for reasons presently unknown.

87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*). Similarly, summary judgment may be granted when only one inference could reasonably be drawn from undisputed evidentiary facts. *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Company, Inc.*, 690 F.2d 1235, 1240 (9th Cir.1982); *British Airways Board v. Boeing*, 585 F.2d 946, 952 (9th Cir.1978); *Empire Electronics Company v. United States*, 311 F.2d 175, 180 (2nd Cir. 1962).

Applying this standard, the Court finds that Defendants have failed to demonstrate the existence of a genuine factual issue regarding their apparent allegation that Plaintiff was improperly involved in the transfer of a copy of his birth certificate from Smith to McKandes. A jury could not properly draw a reasonable inference that Plaintiff had engaged in such conduct from the facts that (i) Plaintiff knew Smith, (ii) Smith went to school with Plaintiff's brothers and sisters, and (iii) Plaintiff tore up and threw away his copy of his birth certificate because it was mutilated. Plaintiff's testimony that during 1981 his wallet and identification papers were lost or stolen is uncontroverted. Defendants have failed to produce specific facts to put Plaintiff's credibility in issue so as to preclude summary judgment on this matter. *See:* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, section 2726, at 118–119 (2nd Ed. 1983); 6 J. Moore & J. Wicker, *Moore's Federal Practice*, para. 56.15, at 56–524 to 56–525 (2nd Ed.1948).

Approximately three months later, but still during 1982, McKandes left Los Angeles and stopped using the identification in Plaintiff's name.

On or about April 20, 1982, Defendant Crotsley caused an arrest warrant to issue in the name of Terry Dean Rogan, charging him with two robbery-murders which occurred in Los Angeles that month. Said warrant listed Plaintiff's name and an alias, but did not contain McKandes' known physical charateristics (e.g., scars, tattoos, height, weight, etc.).

On approximately May 10, 1982, Defendant Slack caused the warrant information to be placed into the national computer arrest warrant notification system known as the National Crime Information Center ("NCIC"). Entry of said information into the NCIC system ensured that any police officer in the United States having access to the system would be made aware that a robbery-murder warrant in the name of Terry Dean Rogan was outstanding in California. Like the warrant upon which it was based, said information set forth Plaintiff's name and an alias, but did not contain McKandes' known physical characteristics.

On or about June 7, 1982, Defendant Crotsley requested that an official police bulletin be completed and forwarded to certain police departments through official channels. Said bulletin contained, *inter alia:* (a) Plaintiff's name; (b) three aliases, one of which contained McKandes' correct surname; (c) McKandes' photograph; (d) McKandes' fingerprint; (e) McKandes' height; (f) McKandes' weight; and (g) notice that the suspect had the tattoo "Connie" on the right side of his chest. The bulletin also stated that the suspect should be considered armed and extremely dangerous. The bulletin's widest area of distribution was achieved by or about March 21, 1983, at which time it was sent to: (a) Chicago, Illinois; (b) Mobile, Alabama; and (c) Detroit, Michigan. None of Plaintiff's arrests at issue herein were made by police departments which relied upon the bulletin or had it in their possession.

During July, 1982, Defendant Slack reentered the pertinant NCIC record without modification or amendment.

On or about October 31, 1982, Plaintiff came into contact with officers of the Carrollton Township Police Department in Saginaw County, Michigan, during the course of a trespassing dispute. Plaintiff was arrested on a charge of resisting arrest. The police officers made an inquiry of the NCIC system. The resulting computer report reflected the existence of the California robbery-murder warrant in Plaintiff's name.

On or about November 1, 1982, the Carrollton police contacted LAPD about the California arrest warrant. The Carrolton police established four days later through fingerprint comparison and Plaintiff's lack of certain scars and tattoos that were visible on the body of the wanted suspect, McKandes, that Plaintiff was not the man wanted by the LAPD. Plaintiff then pleaded (either guilty or *nolo contendre*, the record does not reveal which) to the charge of resisting arrest and was sentenced to "time served" of five days, and released. Upon Plaintiff's initial arrest, the NCIC record regarding the California warrant was automatically removed from the NCIC system.

Later during November, 1982, Defendant Crotsley caused the arrest warrant information in Plaintiff's name to be reentered into the NCIC system without modifying same to reflect either the suspect's (i.e., McKandes') known unique physical characteristics (i.e., scars, tattoos) or the duplicate name-misidentification problem. As reflected by the relevant NCIC data entry form, a NCIC computer record contains a miscellaneous field that allows for the entry of up to 121 characters of information regarding identifying physical charateristics or possible mistaken identity-duplicate name situations.

During February or March, 1983, Plaintiff was a passenger in an automobile which was stopped by Bay County sheriff's deputies outside of Saginaw, Michigan, for failure to use a turn signal. The officers ran a computer check on Plaintiff after he showed the officers his identification. The

California robbery-murder warrant was reported back to the officers in response to their computer check. As a result, Plaintiff was ordered out of the car at gunpoint, searched, handcuffed, and transported to the jail in Bay City, Michigan. Plaintiff was there handcuffed to metal bars while the sheriff's deputies made telephone calls to the Saginaw police and the LAPD in order to determine Plaintiff's status. Plaintiff was released after being held in jail for approximately two hours.

During early 1983, Plaintiff was stopped for a traffic offense by Saginaw police officers and was again detained until the California robbery-murder warrant problem could be clarified. Plaintiff testified that he did not recall the details of this encounter.

Plaintiff then sought the assistance of the local Federal Bureau of Investigation ("FBI") office in Sagnaw. A FBI agent confirmed the existence of a murder warrant in Plaintiff's name in the NCIC system, but informed Plaintiff that only the originating state agency (i.e., the LAPD) could delete, amend, or correct the computer warrant entry.

During July, 1983, Plaintiff traveled from Michigan to Hugo, Oklahoma to visit relatives and to look for employment there and in Kolleen, Texas. On or about July 18, 1983, while driving through Denton County, Texas, Plaintiff was stopped by the police for speeding. The officer's inquiry to the NCIC system again revealed the existence of the outstanding robbery-murder warrant in Plaintiff's name. As a result, Plaintiff was arrested at gunpoint, handcuffed and taken to the nearest jail facility, where he was held for investigation of his true identity. Plaintiff was released after being held in custody for approximately three hours when the relevant finger prints were transmitted to Texas.

Also on or about July 18, 1983, Defendant Crotsley again reactivated the NCIC file in Plaintiff's name without modification.

On or about January 14, 1984, Plaintiff was stopped while driving his car in Saginaw, Michigan, by a county deputy for not having his headlights on. The resulting inquiry into the NCIC system again revealed the existence of the California robbery-murder warrant. Two or three more police cars arrived, including officers armed with shotguns. Plaintiff was apprehended at gunpoint, searched, handcuffed, and taken to the county jail. Plaintiff was then released after officers there on duty vouched for his true identity.

During January, 1984, a reporter for the Saginaw News informed Defendant Crotsley that McKandes, who was by then again incarcerated in an Alabama prison, was the person actually wanted for the robbery-murders in Los Angeles. A FBI agent verified that the fingerprints of the suspect wanted in Los Angeles were those of McKandes.

On January 23, 1984, Defendant Crotsley forwarded the suspect's fingerprints to the Alabama Department of Corrections, and removed the NCIC record in Plaintiff's name.

McKandes was later convicted of the California robbery and murder charges.

During the period of their investigation, the Defendant Officers tried to check the NCIC system at least once per month, and more often if possible, to make sure that the warrant information was still in the system.

### b. APPLICATION OF THE LAW TO THE RELEVANT FACTS.

The leading case in this area of the law is *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). In *Baker* the plaintiff's brother procured a duplicate of the plaintiff's driver's license. *Baker,* 443 U.S. at 140, 99 S.Ct. at 2693. The plaintiff's brother, masquerading as the plaintiff, was arrested on narcotics charges and signed various documents in the plaintiff's name during the booking and bail procedures. *Baker,* 443 U.S. at 140–141, 99 S.Ct. at 2693. The plaintiff's brother then absconded and an arrest warrant was issued in the plaintiff's name. *Baker,* 443 U.S. at 141, 99 S.Ct. at 2693. The plaintiff was subsequently arrested pursuant to said warrant. *Id.* The plaintiff was held in

custody for a three day period over a New Year's weekend before the police recognized their error and released him. *Id.* The Supreme Court rejected the plaintiff's Fourth and Fourteenth Amendment claims, holding:

> *Absent an attack on the validity of the warrant under which he was arrested,* respondent's complaint is simply that despite his protests of mistaken identity, he was detained in ... jail from December 30 ... until January 2, when the validity of his protests was ascertained. Whatever claims this situation might give rise to under state tort law, we think it gives rise to no claim under the United States Constitution.

*Baker,* 443 U.S. at 143–144, 99 S.Ct. at 2694 (Emphasis added.). The Court further explained:

> [O]ne ... could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment. * * * We may ... assume, *arguendo,* that ... mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty ... without due process of law."

*Baker,* 443 U.S. at 144–145, 99 S.Ct. at 2694–2695; *see also id.* at 147–148, 99 S.Ct. at 2696 ("The Court's cases upon occasion have defined [the] liberty [protected by the Due Process Clause of the Fourteenth Amendment] without guidance from the Bill of Rights. For example, it has found police conduct that shocks the conscience to be a denial of due process. *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). * * * I do not understand the Court's opinion to speak to the possibility that *Rochin* might be applied to this type of case or otherwise to foreclose [such application].") (Blackmun, H., concurring).

Several post-*Baker* decisions have found that a mistaken arrest can deprive a person of his Fourth and Fourteenth Amendment rights when: (a) the arrest warrant is constitutionally infirm; or (b) the arrest warrant is valid but (i) the detention resulting from the arrest becomes too lengthy in light of the plaintiff's repeated protests of innocence or (ii) the plaintiff is subjected to repeated arrests despite the fact that after the warrant's issuance the police receive notice of information exonerating the plaintiff. *See, e.g., Guenther v. Holmgreen,* 738 F.2d 879 (7th Cir.1984), *cert. denied,* 469 U.S. 1212, 105 S.Ct. 1182, 84 L.Ed.2d 329 (1985); *McKay v. Hammock,* 730 F.2d 1367 (10th Cir.1984); *Harper v. McDonald,* 679 F.2d 955 (D.C.Cir.1982), *cert. denied,* 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982); *Powe v. City of Chicago,* 664 F.2d 639 (7th Cir.1981); *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981); *Wanger v. Bonner,* 621 F.2d 675 (5th Cir.1980); *Douthit v. Jones,* 619 F.2d 527 (5th Cir. 1980); *Whitley v. Seibel,* 613 F.2d 682 (7th Cir.1980).

Plaintiff contends that: (1) the NCIC record and the arrest warrant upon which it was based violated the particular description requirement of the Fourth Amendment; and (2) the maintenance and reentry of the warrant information in the NCIC system without modification after his November, 1982, Michigan arrest deprived him of his rights under the Fourth and Fourteenth Amendments. Plaintiff's contentions are correct.

The decision in *Powe* is directly on point and the reasoning therein is compelling. *Powe* involved an appeal from a District Court Order granting the defendants' motions for summary judgment "as motions for judgment on the pleadings." *Powe,* 664 F.2d at 642. According to the complaint, the plaintiff was the victim of an armed robbery and lost his wallet containing his identification. *Id.* The robber: (i) was arrested for another crime using the plaintiff's stolen identification; (ii) pleaded guilty; and (iii) was sentenced to two years probation under the plaintiff's name. *Id.* The robber then violated probation, and an arrest warrant was issued in the plaintiff's name with an "a/k/a" (i.e., "also known as") of Ernest Brooks. *Id.* The complaint further alleged that the warrant was placed as a "stop order" with the Chicago

Police Department, "without adequate specificity to identify the intended arrestee." *Powe*, 664 F.2d at 643.

The *Powe* plaintiff was arrested, booked, fingerprinted, photographed and spent the night in jail after a routine computer check during a traffic stop revealed the outstanding warrant in his name. *Id.* The prosecutor learned about the mistake a month later and the plaintiff was exonerated. *Id.* The plaintiff was arrested three more times on the same warrant, and spent one more night in jail. *Id.*

On appeal, the *Powe* Court held that where an arrest is made pursuant to an invalid warrant, *Barker, supra,* cannot be applied to preclude the arrestee's claim of an unconstitutional deprivation of liberty. *Powe*, 664 F.2d at 644; *Accord: Murray v. Chicago*, 634 F.2d 365, 367 (7th Cir.1981). The Court recognized that an arrest warrant that correctly names the person to be apprehended generally satisfies the Fourth Amendment's particularity requirement. *Powe*, 664 F.2d at 645. Conversely, an arrest warrant that incorrectly names the person to be arrested will usually be deemed insufficient to satisfy the Fourth Amendment's particularity requirement unless it includes some other description of the intended arrestee that is sufficient to identify him. *Powe*, 664 F.2d at 645 (Relying upon: *West v. Cabell*, 153 U.S. 78, 85–86, 14 S.Ct. 752, 753–754, 38 L.Ed. 643 (1894)). It is important to recognize that an arrest warrant does not "correctly name" the suspect if it accurately sets forth one or more of the suspect's aliases but fails to provide his correct, legal name. *See: Powe*, 664 F.2d at 645, 646 (Discussing *West* and its progeny.); *Cf. Wanger v. Bonner*, 621 F.2d 675, 682–683 (5th Cir. 1980) (Warrant correctly named the suspect but gave the wrong home address. Court holds that arrest pursuant to said warrant was unconstitutional.). The *Powe* Court observed that:

> [I]t is clear ... that the authorities had probable cause to believe the man (allegedly named Ernest Brooks) who was arrested, charged, convicted and sentenced for a crime had violated his probation. It is also clear ... that the authorities were

not certain of his name.... Where the authorities do not know, or are uncertain of the intended arrestee's name, then the name placed on the warrant is, to one degree or another, arbitrary. *While an arrest warrant may constitutionally use such an arbitrary name designation, it may only do so if, in addition to the name, it also gives some other description of the intended arrestee that is sufficient to identify him.*

*Powe*, 664 F.2d at 647 (emphasis added); *accord: West*, 153 U.S. at 85–86, 14 S.Ct at 753–754. The Court stated:

> In this case our holding is simply that where ... the authorities had reason to suspect that the name placed on the warrant was not the real name of the intended arrestee, then some other description of the intended arrestee, sufficient to identify him must be included in the warrant.

*Powe*, 664 F.2d at 647. The Court further noted that:

> The inclusion of names that might be incorrect, combined with the omission of a specific description of the person sought, create a substantial risk ... that a person to whom not the least suspicion has attached will be arrested. The risk cannot be tolerated under the Fourth Amendment. *It is all the more intolerable because it was avoidable: in Powe's case ... the authorities clearly had sufficient contact with the man who violated probation to be able to describe him in the warrant. The failure to describe him, although the authorities knew there was some uncertainty about his true name, renders the warrant invalid.*

*Powe*, 664 F.2d at 648 (Emphasis added.).

The *Powe* Court observed that the plaintiff had the burden of proving that his arrests were made pursuant to the invalid warrant, and not on some other, constitutionally valid basis. *Powe*, 664 F.2d at 648. The Court further observed that:

> Powe alleges that at his first arrest he was initially stopped for a traffic offense. He does not contest this initial

stop, and nothing in his complaint suggests that it was improper. Nonetheless, it is clear from a fair reading of his complaint that he was taken into custody, after the initial stop, on the basis of the challenged probation violation warrant. The same is true of Powe's allegations regarding his second arrest. He does not contest his initial stop for speeding, nor does he contest being taken to the police station to post a $25.00 bond. However, as with his first arrest, the complaint makes clear that he was booked and held on bail because of the probation-violation warrant, not because of the traffic violation. We see no inadequacy in the allegations regarding the first two arrests.

*Powe,* 664 F.2d at 648. After ascertaining that the plaintiff's allegations regarding his last two arrest were sufficient, albeit vague, the Court concluded:

In sum, we hold that Powe's complaint adequately alleges that on four occasions he was deprived of his liberty on the basis of a constitutionally defective arrest warrant. The complaint therefore satisfies the first prong of the *Monell* prima facie case.

*Powe,* 664 F.2d at 649; *Cf. Maney v. Ratcliff,* 399 F.Supp. 760, 764–765, 773 (E.D. Wis.1975) (Case involving arrests based on a NCIC entry. Court notes that "[r]epeated arrests without subsequent prosecution is a violation of [the] Fourth Amendment...").

With one exception discussed below, *Powe* is identical to the present case in all *material* respects. In *Powe* the arrest warrant contained neither the suspect's correct, legal name, nor his description.

Likewise, in the present case neither the arrest warrant nor the NCIC record created pursuant thereto contained the suspect's correct, legal name or his description. In both cases the police had sufficient contact with the suspect to be able to describe him in the warrant. In both cases the police were put on notice that the suspect's true name was uncertain by the fact that the suspect used aliases. Moreover, in both cases, unlike *Barker, supra,* the plaintiff's initial misidentification due to the inadequately descriptive, incomplete and mistaken information was followed by subsequent arrests. In *Powe* the police failed to amend the arrest warrant and the "stop order" after the plaintiff's initial erroneous arrest. More compellingly, the Defendant Officers not only failed to amend the NCIC record after Plaintiff's initial misidentification, but also caused the information to be reactivated without amendment.

There is one obvious factual distinction between *Powe* and the present case. The *Powe* plaintiff was mistakenly arrested pursuant to an insufficiently particular, incomplete, and mistaken warrant.[3] Plaintiff herein was arrested pursuant to insufficiently particular, incomplete and mistaken NCIC record. The Court finds that this factual distinction is immaterial. The Court is guided by the reasoning set forth in *United States v. Mackey,* 387 F.Supp. 1121 (D.Nev.1975).

*Mackey* involved a motion to suppress the admission into evidence of a shotgun that was seized during a search incident to the defendant's arrest. *Mackey,* 387 F.Supp. at 1121–22. The defendant was arrested in Nevada pursuant to a NCIC

---

**3.** It appears that this is not precisely correct. The arrest warrant was issued by the Cook County Probation Department. *Powe,* 664 F.2d at 642. The warrant was lodged with the Cook County Sheriff's Fugitive Warrant Section, and was placed as a "stop order" in the Chicago Police Department computer. *Powe,* 664 F.2d at 643. Although the opinion is unclear, it appears that the Chicago police officers were in fact relying upon the "stop order," and not the actual warrant, when they arrested the plaintiff. *See: Id.* The *Powe* Court ignored the separate existence of the stop order and applied the Fourth Amendment's particularity requirement only to

the warrant. *See: Powe,* 664 F.2d at 644–649. Although the issue was not specifically addressed by the Court, it is apparent that the warrant's fatal lack of particularity was not cured in the stop order.

The analogy between *Powe* and the present case is strengthened by the fact that: (a) in both cases the plaintiff was arrested by one police agency in reliance upon computer record inserted by another law enforcement agency; and (b) the *Powe* Court found it unnecessary to discuss the application of the Fourth Amendment's particularity requirement to the separate computer record.

notice that he was wanted in Monterey, California for a probation violation. *Id.* However, the warrant for the defendant's arrest for a probation violation had been satisfied approximately five months prior to said arrest. *Id.* The Court noted that under the heading "Steps to Assure Accuracy of Stored Information", the relevant NCIC policy statement provides:

A. The FBI/NCIC and state control terminal agencies will make continuous checks on records being entered in the system to assure system standards and criteria are being met.

B. Control terminal agencies shall adopt a careful and permanent program of data verification including:

1. Systemic audits conducted to insure that files have been regularly and accurately updated.

2. *Where errors or points of incompleteness are detected the control terminal shall take immediate action to correct or complete the NCIC record as well as its own state records.*

*Mackey,* 387 F.Supp. at 1123 (Emphasis added.) (Quoting "National Crime Information Center (NCIC) Computerized Criminal History Program Backround, Concept and Policy," approved June 11, 1974, at 12.); *see also:* 28 C.F.R. 20.35(b), (e), (h) (1986) (Policies proposed by the Board become binding when adopted by the Director of the FBI.); *Cf.* 28 C.F.R. 20.37 (1986) ("It shall be the responsibility of each criminal justice agency contributing data to [the] ... system to assure that information on individuals is kept complete, accurate and current....")[4]; *see also:* 28 C.F.R. 20.30, 20.31(a) (1986) (Section 20.37 governs the NCIC system.). The Court observed that:

Because of the inaccurate listing in the NCIC computer, defendant was a "marked man" for the five months prior to his arrest. * * * At any time, as demonstrated by this situation, a routine check by the police could well result in defendant's arrest, booking, search and detention. Further, there is no evidence to suggest that defendant would not con-

tinue to be subject to such humiliation until Monterey police officials cleared the computer of the warrant. * * * Moreover, this could happen anywhere in the United States where law enforcement officers had access to NCIC information. Defendant was subject to being deprived of his liberty at any time and without any legal basis.

The Court went on to hold:

The Court finds that a computer inaccuracy of this nature and duration, even if unintended, amounted to a capricious disregard for the rights of the defendant as a citizen of the United States. The evidence compels a finding that the government's action was equivalent to an arbitrary arrest, and that an arrest on this basis deprived defendant of his liberty without due process of law.

*Mackey,* 387 F.Supp. at 1125. The Court granted the defendant's motion to suppress. *Id.*

■ The decision in *Mackey* reflects the fact that information produced by the NCIC system is used as the functional equivalent and extension of arrest warrants. *See: Mackey,* 387 F.Supp. at 1122. Most importantly, the reasoning in *Mackey* persuasively supports the proposition that such information must be judged, at minimum, by the same standards as those applicable to arrest warrants. To rule otherwise in this highly computerized age would largely obviate the protection afforded by the Fourth Amendment's particularity requirement.

■ In the present case, like *Mackey,* probable cause for all but Plaintiff's initial arrest (as opposed to the reason for the traffic stops) was based solely on the NCIC information. Moreover, as previously noted, each NCIC computer record provides a 121 character field for additional information regarding, *inter alia,* the suspect's description and misidentification-duplicate name problems. Significantly, Defendants have neither contended nor produced evidence indicating that it was not possible, or even merely impractical, to insert informa-

---

4. 28 C.F.R. 20.37 (1986) has not been amended since its adoption on May 20, 1975, prior to the acts and omissions at issue herein. *See:* 28 C.F.R. pg. 301 (1986); 40 Fed.Reg. 22114 (1975).

tion regarding McKandes' tattoos and scars and Plaintiff's misidentification in said field because, for example, it contained more important information. The relevant data entry form reflects that at any given time at least 71 spaces were available for additional information even assuming, *arguendo*, the information already set forth in said field was of overriding importance.[5] As noted above, the pertinent NCIC policy statement expressly requires that the inputing agency "take immmediate action to correct or complete the NCIC record" when "errors or points of incompleteness are detected." *Mackey*, 387 F.Supp. at 1123; *Cf.* 28 C.F.R. 20.37 (1986). The LAPD cannot, at least given the NCIC system's information capabilities and operating requirements, constitutionally cause the arrest of a person via the insertion of information into the NCIC system where, under *Powe* and *West*, such information would be insufficiently descriptive to support an arrest pursuant to a warrant containing same. *See: Maney*, 399 F.Supp. at 773 ("The fact that the defendants did not personally make the arrests of plaintiff does not extinguish their accountability, since [section] 1983 explicitly imposes liability on someone who *causes* a deprivation of constitutional rights.").

▮ The only *material* distinction between *Powe* and the present case concerns Plaintiff's first arrest and resulting incarceration. As noted above, the *Powe* plaintiff had the burden of proving that his arrests were made pursuant to the invalid warrant. *Powe*, 664 F.2d at 648. By analogy, Plaintiff herein has the burden of proving that a given incarceration was caused, prolonged, or otherwise adversely effected by the local authorities' reliance upon the NCIC record. It is clear that Plaintiff's last four (4) arrests and detentions after traffic stops satisfy this requirement. However, Plaintiffs first incarceration was the result of a trespasing dispute and the related charge of resisting arrest. Plaintiff pleaded (either guitly or *nolo contendre*, the record does not reflect which) to the charge of resisting arrest and was sentenced to "time served." The Court recognizes that Plaintiff *may* have: (i) been initially held in custody, rather than released on bail on the charge of resisting arrest, because of the NCIC record; and (ii) found it advisable, having already spent five (5) days in jail, to plead to the charge of resisting arrest with the understanding that the district attorney would recommend that he be sentenced to time served. However, Plaintiff has neither contended that he was innocent of the charge of resisting arrest nor offered any evidence tending to support any of the possibilities delineated above. Moreover, Plaintiff's sentence of "time served" establishes that his period of incarceration was not prolonged because of the NCIC record. Thus, the Court holds that: (a) Plaintiff's initial arrest was not caused by the NCIC record; (b) the duration of his resulting incarceration was not prolonged by same; and (c) Plaintiff was neither subjected to an illegal seizure in violation of the Fourth Amendment nor deprived of his liberty without due process of law in violation of the Fourteenth Amendment.[6]

---

5. In fact, at any given time 41 out of the 50 filled spaces in the miscellaneous field were used for the operator's identification number (26 characters) and the NCIC record number (15 characters). Thus, the amount of space devoted to information concerning the suspect's description or any misidentification-duplicate name problems could be substantially increased if these items were omitted, shortened, or entered into another field.

6. The Court does not intend to imply that the length of detention alone is necessarily controlling. A core concept of the Fourth Amendment is the right to be free from unreasonable interference by police. *Terry v. Ohio*, 392 U.S. 1, 8–9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968).

Obviously, the reasonableness of police conduct depends upon the facts of a given case. *Id.* While it may be reasonable to apprehend a presumably armed and dangerous murder suspect by the application of immediately overwhelming force at gunpoint, restrict his privileges and visitors while incarcerated, set bail at a very high amount, and hold a news conference trumpeting the arrest for murder, it might not be reasonable to do the same to a person *properly* arrested solely for speeding.

The Court can imagine situations where, although a person was legitimately arrested for another crime and the the local officers' inquiry concerning an insufficiently particular NCIC description did not lengthen his period of his

■ In sum, the Court holds that Plaintiff was unconstitutionally deprived of his liberty during his last four arrests and detentions. The Court bases said holding upon two independently sufficient but mutually supportive grounds. First, the Court has determined that the NCIC record and the arrest warrant upon which it was based violated the particular description requirement of the Fourth Amendment. *See: Powe*, 664 F.2d at 649. Secondly, the Court finds that the maintenance and multiple reentry of the NCIC record without amendment after Plaintiff's initial misidentification as the suspect caused him to be arrested and detained without due process of law. *See: Powe*, 664 F.2d 644–649; *Mackey*, 387 F.Supp. at 1125; *Maney*, 399 F.Supp. at 773. The Court further holds that Plaintiff's first incarceration for resisting arrest was not caused, prolonged, or adversely effected by either the robbery-murder warrant or the NCIC record created pursuant thereto. *See: Powe*, 664 F.2d 648. Plaintiff therefore has carried his burden of proof on the first prong of the *Monell* municipal liability test only as to his last four incarcerations.

### 2. CAUSATION OF THE DEVIATION BY OFFICIAL POLICY, CUSTOM OR USAGE.

#### a. THE LAW.

■ It is well settled that inadequate training or supervision can constitute an actionable policy or custom under the second prong of the *Monell* municipal liability test. *Bergquist v. County of Cochise*, 806 F.2d 1364, 1370 (9th Cir.1986). However, mere negligence does not give rise to section 1983 liability. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 666–67, 88 L.Ed. 662 (1986); *Bergquist*, 806 F.2d at 1370. Conversely, a "policy" of *gross* negligence in training or supervision gives rise

to section 1983 liability. *Bergquist*, 806 F.2d at 1370 (Relying upon: *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Herrera v. Valentine*, 653 F.2d 1220, 1224 (8th Cir.1981); *Owens v. Haas*, 601 F.2d 1242, 1246 (2nd Cir.1979), *cert. denied*, 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979)). Thus, a city may be held liable either for the grossly negligent failure to implement a training program for its officers or for implementing a program grossly inadequate to prevent the type of harm suffered. *Id.* Such gross negligence must manifest deliberate indifference to the resulting violations of the citizen's constitutional rights. *Languirand*, 717 F.2d at 227; *Herrera*, 653 F.2d at 1224; *Owens*, 601 F.2d at 1246; *see also: Hays*, 668 F.2d at 874 (Municipal liability only where there is a complete failure to train or training is so reckless or grossly negligent that future police conduct is almost inevitable or substantially certain to result.).

■ The requisite policy, custom or usage may not be proved through reference to a single unconstitutional incident unless "proof of the incident includes proof that it was caused by an existing unconstitutional ... policy." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *Bergquist*, 806 F.2d at 1370 n. 1. In contrast, it is sufficient to show a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct or that serious incompetence or misbehaivor was general or widespread throughout the police force. *Languirand*, 717 F.2d at 228.

#### b. RELEVANT FACTS.

Information in the NCIC system can be withdrawn, added to, corrected, or amend-

---

incarceration, said inquiry caused the conditions of his arrest and detention to be far more severe than they otherwise would have been. Without deciding the issue, the Court recognizes that such additional adverse conditions of arrest or incarceration *may* constitute a violation of a person's rights under the Fourth, and Fourteenth Amendments even if the initial arrest and period of incarceration did not violate same.

Plaintiff herein has failed to produce any evidence or even allege that the conditions of his initial apprehension and resulting incarceration for resisting arrest differed in any way from those he would have been subject to absent the NCIC record. Unlike Plaintiff's subsequent arrests, he was not apprehended at gunpoint. Moreover, Plaintiff was handcuffed prior to the NCIC inquiry as a result of his resisting arrest.

ed by the law enforcement agency that originally inserted same. However, neither Defendant Slack nor Defendant Crotsley received any training in the procedures for or the necessity of amending information that had been entered into the NCIC system when additional or more accurate information becomes available. The Defendant Officers did not discuss the possibility of adding information to the NCIC record in response to Plaintiff's original misidentification as the suspect.

Defendant Slack has placed information into the NCIC system at least several hundred times during his career as a police officer. Defendant Slack never amended a NCIC file record when more complete or accurate information became available. Moreover, Defendant Slack did not know for sure if it was possible to do so.

Similarly, Defendant Crotsley never considered whether it was possible to insert information into the NCIC system that would alert the officers using the system about the misidentification-dual name problem. Defendant Crotsley was not aware of any LAPD policy addressing dual name-misidentification situations. Defendant Crotsley's policy in such situations was to give the innocent person a computer print-out of the warrant and his business card as evidence of the person's innocence *only if* the person came to Los Angeles and picked the items up personally. Defendant Crotsley testified that he had followed this procedure on four prior occasions, and that "quite a few other police officers" followed the same procedure. During the seventeen years Defendant Crotsley was a police officer it was not the custom for investigators to obtain their superior's approval prior to inserting information into the system. Defendant Crotsley received no instructions or supervision from his superiors regarding the information to be inserted into the NCIC system in this case. However, Defendant Crotsely's superiors were aware of his reactivation of the NCIC entry after Plaintiff's initial misidentification.

LAPD's NCIC operators and supervisors do not make any independent decisions regarding the information inserted into the

system, but instead follow the investigators' instructions.

There is one and only one reasonable and permissible factual inference possible given this uncontroverted evidence. *See:* n. 2, *supra.* Said inference is that the Defendant City (i) failed to adopt any policy, (ii) to train, and (iii) to supervise the Defendant Officers regarding: (a) the Fourth Amendment requirement that both the arrest warrant and the initial NCIC record describe the suspect with particularity; and (b) the procedures for and the necessity of amending the NCIC record when additional or more accurate descriptive information became available.

### c. APPLICATION OF THE LAW TO THE FACTS.

### (i) THE DEFENDANT OFFICERS' FAILURE TO ADEQUATELY DESCRIBE THE SUSPECT IN THE WARRANT AND THE NCIC RECORD CREATED PURSUANT THERETO.

■ This Court's analysis is again guided by the reasoning in *Powe.* The *Powe* Court observed:

> In the present case, Powe has alleged that he was the victim of a series of unlawful arrests, each arrest based on the same, allegedly invalid, warrant. In our view, his allegations are sufficient to raise the inference that the municipal defendants are responsible for the challenged arrests. * * * Assuming the warrant was invalid, its invalidity would be ... in the failure of the municipal authorities to include in the warrant an adequate description of the person sought. *This failure to describe the arrestee was repeated four times. We find it reasonable to infer that the inadequacy of the description in the warrant was systemic in nature—that is, that it resulted from the procedures followed by the defendant's law enforcement agencies in issuing warrants of the type involved here.*

*Powe,* 664 F.2d at 651 (Emphasis added.). The Court went on to hold that the plaintiff's complaint satisfied the second prong of the *Monell* municipal liability test. *Id.*

In *Powe* the plaintiff was misidentified as the suspect four times. Plaintiff herein was so misidentified five times. The Defendant Officers tried to check the NCIC system at least once per month to make sure that the entry was still in the system. Moreover, the Defendant Officers reactivated the erroneous and incomplete NCIC record three times (i.e., once before Plaintiff's initial misidentification and twice afterward). Defendant Crotsley was aware of at least four prior occasions where such problems arose. Similarly, Defendant Crotsley testified that "quite a few other police officers" had dealt with the same problem in the same way in which he did. The only reasonable and permissible inference given the uncontroverted facts set forth in Section II.A.2.b. above (*See,* n. 2, *supra.*) is that the insufficiently descriptive warrant and NCIC record were: (i) systemic in nature; and (ii) the result of the Defendant City's grossy negligent and indifferent failure to adequately train and/or supervise the Defendant Officers, or to even adopt and make known appropriate policy.

(ii) THE DEFENDANTS' MAINTENANCE AND REENTRY OF THE INADEQUATELY DESCRIPTIVE NCIC RECORD AFTER RECEIVING NOTICE OF PLAINTIFF'S INITIAL MISIDENTIFICATION AS THE SUSPECT.

■ The analysis under *Powe* set forth in section II.B.2.c.(i) immediately above is equally applicable here. Moreover, as previously noted, the relevant NCIC policy statement requires that state agencies *"adopt a careful and permanent program of data verification* including * * * tak[ing] immediate action to correct or complete the NCIC record as well as its own state records" when "errors or points of incompleteness are detected." *See: Mackey,* 387 F.Supp. at 1123; *Cf.* 28 C.F.R. 20.37 (1986). The purpose of this requirement is obviously to protect innocent persons. *See: Mackey,* 387 F.Supp. at 1123 ("In a national

system ... individual users are responsible for the accuracy, validity, and completeness of their record entries ... and more stringent controls with respect to system discipline are required." Quoting "National Crime Information History Center (NCIC) Computerized History Program Backround, Concept and Policy," approved June 11, 1974, at 3.). Thus, the Defendant City's failure to adopt such a program was negligent *per se.*[7] *See:* Restatement (Second) of Torts, section 285(b), 286, 288B(1) (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts,* section 36, at 229–230 (5th Ed.1984); 2 F. Harper & F. James, Jr., *The Law of Torts,* section 17.6, at 994 *et seq.* (1956).

Most importantly, the breach of an official policy constitutes reckless disregard for the safety of those for whose protection it is adopted when omission of the required precautions involves a high degree of probability that serious harm will result. Restatement (Second) of Torts, section 500 comment e (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts,* section 34, at 214 (5th Ed.1984); *see, e.g., Lewis v. Zell,* 279 Ala. 33, 181 So.2d 101 (1965). Such is the case here. Plaintiff was subjected to the pain and humiliation of being arrested, handcuffed, searched, booked, and incarcerated. Moreover, as Chief Judge Bazelon recognized, an arrest record creates a continuing disability:

Information denominated a record of arrests, if it becomes known, may subject an individual to serious difficulties. Even if no direct economic loss is involved, the injury to an individual's reputation may be substantial. Economic losses themselves may be both direct and serious. Opportunities for schooling, employment, or professional licenses may be restricted or nonexistant as a consequence of the mere fact of an arrest, even if followed by acquittal or complete exoneration of the charges in-

---

7. Conversely, mere compliance with legislation, regulation or official policy does not prevent a finding of negligence where a reasonable man would take additional precautions. Restatement (Second) of Torts, section 288(C) (1965); W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts,* section 36, pg. 233 (1984).

volved. An arrest record may be used by the police in determining whether subsequently to arrest the individual concerned, or whether to exercise their discretion to bring formal charges against an individual already arrested. Arrest records have been used in deciding whether to allow a defendant to present his story without impeachment by prior convictions, and as a basis for denying release prior to trial or an appeal; or then may be considered by a judge in determining the sentence to be given a convicted offender.

*Menard v. Mitchell,* 430 F.2d 486, 490, 491 (D.C.Cir.1970). Most compellingly, Plaintiff's life was endangered each time he was apprehended at gunpoint by police officers who believed that he was an armed and dangerous murder suspect. Said danger of serious harm was both highly probable and forseeable. Such reckless conduct, if not less, constitutes "gross negligence." *See: Languirand,* 717 F.2d at 220; *Owens,* 601 F.2d at 1246; Restatement (Second) of Torts, section 282 comment e (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts,* section 34, at 212–214 (5th Ed.1984); 2 F. Harper & F. James, Jr., *The Law of Torts,* section 15.15, at 953–59 (1956). Thus, the Defendant City's above-defined failure to train or supervise its police officers satisfies the gross negligence test. *See: James v. Murphy,* 392 F.Supp. 641, 644 (M.D.Ala. 1975) (Complaint alleges that the defendant's violation of law enacted to prevent the harm that was inflicted on the plaintiff constituted "gross nelilgence *per se.*" Court holds that complaint states a cause of action under 42 U.S.C. section 1983 upon which relief can be granted.).

### (iii) SUMMARY

The Court finds that the Defendant City's failure to (i) adopt any policy, (ii) train, and (iii) supervise its police officers regarding: (a) the Fourth Amendment requirement that the arrest warrant and the NCIC record created pursuant thereto describe the suspect with particularity; and (b) the procedures for and the necessity of amending the NCIC record when additional or more accurate descriptive information became available were both grossly negligent and systemic in nature.

### 3. CONCLUSION

For the reasons stated, the Court holds that there is no material question of fact and that Plaintiff is entitled to judgment against the City of Los Angeles on the 42 U.S.C. section 1983 liability issue as a matter of law. *See:* Fed.R.Civ.P. 56(c). The Court, however, believes it is appropriate to emphasize the limited scope of said holding.

The Court recognizes that: (i) the Defendant Officers were diligently seeking to apprehend a dangerous murder suspect; (ii) the suspect, McKandes, had used Plaintiff's name; and (iii) said officers had probable cause to place Plaintiff's name on the arrest warrant and the NCIC record created pursuant thereto (*See: Powe,* 664 F.2d at 647.). However, Defendants mistakenly contend that the officers were faced with the choice of either proceeding as they did or not acting at all. Defendants fail to recognize the third option which would allow the officers to discharge their duties to apprehend McKandes and to respect Plaintiff's constitutional rights. This option was to: (1) insert the additional descriptive information concerning McKandes (re: scars, tattoos, etc.) into the arrest warrant and NCIC record; and (2) amend same to reflect the misidentification-duplicate name problem after Plaintiff's initial misidentification.

### B. 42 U.S.C. 1983 ACTION AGAINST THE DEFENDANT OFFICERS.

The initial inquiry in a section 1983 action against an individual defendant must focus on whether: (a) the conduct complained of was committed under color of state law; and (b) this conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *McKay,* 730 F.2d at 1367. If the claim arises out of the defendant's performance of his discretionary functions, the Court must then determine whether he is entitled to the defense of qualified immunity. *See, e.g., Harlow v.*

*Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

### 1. ACT OR OMISSION UNDER COLOR OF STATE LAW.

The Defendant Officers do not contest that they engaged in the conduct complained of in their capacity as police officers and under color of state law. The uncontroverted evidence clearly establishes same.

### 2. DEPRIVATION OF A CONSTITUTIONALLY PROTECTED INTEREST.

█ In section II.A.3., *supra,* the Court held that Plaintiff was unconstitutionally deprived of his liberty during his last four (4) arrests and detentions. The Court based said holding upon its findings that: (a) the NCIC record and the arrest warrant upon which it was based violated the particularity requirement of the Fourth Amendment; and (b) the maintenance and multiple purposeful reentry of the NCIC record without amendment after Plaintiff's initial misidentification as the suspect caused him to be arrested and detained without due process of law.

Both of the Defendant Officers deprived Plaintiff of his Fourth and Fourteenth Amendment rights. Defendant Crotsley requested the constitutionally infirm arrest warrant and reactivated the insufficiently particular NCIC record on two occasions without modification. Defendant Slack originally entered the warrant into the NCIC system and reactivated the NCIC record without amendment once. The Defendant Officers attempted to check the NCIC system at least once a month to ensure that the record was not removed. Moreover, the uncontroverted evidence clearly establishes that the Defendant Officers were working together and jointly responsible for the conduct of the investigation.

### 3. QUALIFIED IMMUNITY.[8]

█ Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Anderson v. Creighton,* — U.S. —, —, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (*"Anderson"*); *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. at 2738; *Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). This test is equally applicable to suits brought against state officials under 42 U.S.C. section 1983 and suits brought directly under the Constitution against federal officials. *Harlow,* 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30; *Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). Government officials "must be held to a standard of conduct based on ... knowledge of the basic, unquestioned constitutional rights." *Wood,* 420 U.S. at 322, 95 S.Ct. at 1000–1001. Law enforcement officials are responsible for keeping abreast of constitutional developments in criminal law. *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986). The Court must look at: (a) binding precedent; or, in the absence thereof, (b) all available decisional law including decisions of state courts, other circuits, and district courts to determine whether the right was clearly established. *Ward,* 791 F.2d at 1332; *Capeoman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985). An additional factor is the liklihood that the Supreme Court or the Ninth Circuit would have reached the same results as courts that had already considered the issue. *Ward,* 791 F.2d at 1332; *Capeoman,* 754 F.2d at 1515. The government official is not expected to predict the future course of constitutional law. *Procunier,* 434 U.S. at 562, 98 S.Ct. at 860; *Wood,* 420 U.S. at 322, 95 S.Ct. at 1001; *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967).

---

8. Defendants failed to distinguish between the Defendant City and the Defendant Officers when they discussed the qualified immunity doctrine in their various motion papers. A municipality cannot assert the good faith or qualified immunity of its officers or agents as a defense to liability under 42 U.S.C. section 1983. *Owen v. City of Independence, Missouri,* 445 U.S. 622, 637, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).

A police officer's reliance on a warrant is not *per se* reasonable merely because a judicial officer has found probable cause exists. *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); *Bergquist*, 806 F.2d at 1368. As discussed in greater detail below, the Court must consider whether a reasonable officer in the position of the Defendant Officers would have known that: (a) that he should have neither applied for the insufficiently descriptive warrant nor created the NCIC record containing said description, but instead should have utilized the available identification information; or (b) amended the NCIC record to reflect the misidentification-dual identity problem after he received notice of same. *Cf. Anderson*, — U.S. at —, 107 S.Ct. at 3039. (Probable cause or exigent circumstances for warrantless search.); *Malley*, 106 S.Ct. at 1098 (Failure of officer's affidavit to establish probable cause.); *Bergquist*, 806 F.2d at 1368 (Same).

In *Anderson*, the Supreme Court recently recognized that:

The operation of [the qualified immmunity] standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the due process clause, and thus there is a

sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. * * * But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*. Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Anderson*, — U.S. at —, 107 S.Ct. at 3038–3039 (Footnotes omitted.). The *Anderson* Court went on to hold:

[O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson*, — U.S. at —, 107 S.Ct. at 3039 (Citations omitted, emphasis added.).[9]

9. The Court recognizes that summary judgment is particularly appropriate in the area of qualified immunity. Whether the law was clearly established at the time of the events at issue is a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Similarly, the issue of whether a given individual defendant is entitled to qualified immunity is a question of law to be determined on a motion for summary judgment. *Windsor v. The Tennessean*, 719 F.2d 155, 165 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984).

In *Harlow* the Supreme Court noted:
Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law should ... permit the resolution of ... insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an offi-

cial could not reasonably be expected to anticipate subsequent legal developments nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.
*Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (Footnotes omitted.). Similarly, in *Anderson* the Supreme Court recently observed:
One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from broad ranging discovery that can be peculiarly disruptive of effective government. For this reason, we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of the litigation. Thus, on remand, it should first be determined whether the actions [complained of] are the actions that a reasonable officer coulde have believed lawful. If they are, then Anderson is entitled to dismissal prior to discovery.
*Anderson*, — U.S. at —, 107 S.Ct. at 3032 n. 6 (citations omitted.).

## a. APPLICATION OF THE LAW TO THE RELEVANT FACTS.[10]

At the time of the Defendants actions and omissions herein it was well established under *Powe, West,* and the latter's progeny that the warrant violated the particular description requirement of the Fourth Amendment. *See:* Section II.A.1., *supra.* A reasonable officer in the position of the Defendant Officers would have known this given his responsibility to keep abreast of constitutional developments in criminal law. *See: Malley,* 106 S.Ct. at 1098; *Bergquist,* 806 F.2d at 1368; *see also: Ward,* 791 F.2d at 1332. The Court, however, believes that this alone is not dispositive.

It is possible to characterize Plaintiff's last four arrests as having been made "pursuant to" or "under" the insufficiently particular warrant. The warrant provided the legal basis for the creation of the NCIC record, and through the record, said arrests. Obviously, Plaintiff never would have been arrested if Defendant Crotsley had not obtained the warrant. However, it is clear that the authorities who arrested Plaintiff were in fact relying upon the insufficiently particular NCIC record, and never did see the warrant. Moreover, the one page police bulletin issued pursuant to the warrant contained, unlike the NCIC record, all of the descriptive information at the disposal of the Defendant Officers. Said bulletin largely cured the deficiency in the warrant factually, if not legally, as to, and only as to, those officers who (unlike those who arrested Plaintiff) relied upon same. *Cf. United States v. Hayes,* 794 F.2d 1348, 1354 (9th Cir.1986) ("An affidavit may be relied on to provide the requisite particularity in an otherwise overbroad warrant only if (1) the affidavit accompanies the warrant, and (2) the warrant uses suitable words of reference which incorporate the affidavit therein."); *United States v. Hillyard,* 677 F.2d 1336, 1340 (9th Cir. 1982) (Same). Thus, the Court finds that in order for the right to be "sufficiently clear that a reasonable official would understand

that what he is doing violates that right," "the contours of the right" must be defined not by the application of the Fourth Amendment's particular description requirement to the arrest warrant, but by the application of said requirement to the NCIC record.

The distinction between the application of the Fourth Amendment's particular description requirement to NCIC records as opposed to arrest warrants is critical. While, as previously noted, the application of the Fourth Amendment's particularity requirement to arrest warrants was well established at the time of the Defendant Officers' acts and omissions, the application of said requirement to NCIC records was not. The parties failed to cite any case where the facts which a reasonable police officer would believe are material are identical to those in the present case, and the Court has been unable to locate same. Although the Court holds that, with regard to Plaintiff's last four arrests, *Powe* is materially indistinguishable from the present case (*See:* Section II.A.1.b.), the Defendant Officers cannot reasonably be expected to have predicted this result. *See: Procunier,* 434 U.S. at 562, 98 S.Ct. at 860 (The government official is not expected to predict the future course of constitutional law.); *Wood,* 420 U.S. at 322, 95 S.Ct. at 1001 (Same); *Pierson,* 386 U.S. at 557, 87 S.Ct. at 1219 (Same).

In summary, the Court holds that the Defendant Officers' conduct and omissions did not violate Plaintiff's then clearly established constitutional rights of which a reasonable person would have known. *See: Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Procunier,* 434 U.S. at 565, 98 S.Ct. at 861; *Wood,* 420 U.S. at 322, 95 S.Ct. at 1001. Therefore, the Defendant Officers' qualified immunity remains intact, and Plaintiff's action for damages against them under 42 U.S.C. section 1983 must fail.

### b. CONCLUSION

For the reasons stated, the Court holds that there is no material question of fact

10. The set of relevant "facts" includes the state of the law of arrest under the Fourth Amendment during the time at issue herein, 1982 to

1983. *See: Ward,* 791 F.2d at 1332; *Capeoman v. Reed,* 754 F.2d at 1514.

and that the Defendant Officers are entitled to judgment against Plaintiff as a matter of law on: (a) the issue of qualified immunity; and therefore (b) Plaintiff's 42 U.S.C. section 1983 claim for damages. *See:* Fed.R.Civ.P. 56(c).

## III. ORDER

Pursuant to the foregoing recital of undisputed facts, it is hereby ORDERED, ADJUDGED AND DECREED that:

1. There is no material question of fact and that Plaintiff is entitled to judgment against the City of Los Angeles on the 42 U.S.C. section 1983 liability issue as a matter of law.

2. There is no material question of fact and that the Defendant Officers are entitled to judgment against Plaintiff as a matter of law on: (a) the issue of qualified immunity; and therefore (b) Plaintiff's 42 U.S.C. section 1983 claim.

The Clerk shall send, by United States mail, a copy of this Memorandum of Decision and Order to counsel for the parties.